## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GLENN GATES and DONNA GATES, h/w, | CLASS ACTION |
| Plaintiff, | NO. 06-1743 |
| v. | |
| ROHM AND HAAS COMPANY, et al., | |
| Defendants. | |

## DEFENDANT MODINE MANUFACTURING COMPANY'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Albert G. Bixler (I.D. No. 45639)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, PA 19102
(215) 851-8412

David Bartel (Wis. Bar No. 1012817)
Cristina D. Hernandez-Malaby
(Wis. Bar. No. 1038817)
QUARLES & BRADY LLP
411 E. Wisconsin Avenue
Milwaukee, WI 53202
(414) 277-5000

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION .............................................................................................. 1

BACKGROUND ............................................................................................... 6

 I. THE RINGWOOD FACILITIES. .......................................................... 6

 II. SUMMARY OF PLAINTIFFS' ALLEGATIONS .................................... 7

 III. THE ABSENCE OF EVIDENCE OF CONTAMINATION IN THE VILLAGE ............ 8

 IV. THE DIFFERING SUBSURFACE CONDITIONS IN THE VILLAGE ..................... 10

 V. THE INDIVIDUALIZED NATURE OF CONTAMINATION
  AND EXPOSURE DETERMINATIONS............................................... 11

  A. Is there any exposure at all to this individual?............................. 11

  B. If there were some exposure, how much, for how long?............. 12

  C. How has each individual's property been impacted? ................. 13

ARGUMENT.................................................................................................... 14

 I. PLAINTIFFS CANNOT SATISFY THEIR HEAVY BURDEN OF
  DEMONSTRATING THAT CLASS CERTIFICATION IS APPROPRIATE IN
  THIS MASS TORT ACTION ......................................................... 14

 II. PLAINTIFFS CANNOT EVEN SATISFY THE IMPLICIT THRESHOLD
  REQUIREMENTS FOR CLASS CERTIFICATION.............................. 16

  A. The named Plaintiffs lack standing to bring the claims
   alleged in the Amended Complaint and therefore cannot act
   as class representatives ....................................................... 16

  B. Plaintiffs' classes are not ascertainable and therefore cannot
   be certified ....................................................................... 19

 III. PLAINTIFFS' CLASSES DO NOT MEET THE PREREQUISITE OF RULE
  23(A), SPECIFICALLY COMMONALITY, TYPICALITY, ADEQUACY ............... 19

 IV. THE INDIVIDUAL DIFFERENCES THAT WILL NEED TO BE EXAMINED TO
  DETERMINE EXPOSURE AND RISK PRECLUDE CERTIFICATION UNDER
  RULE 23(B)(3) .......................................................................... 20

  A. The predominance requirement of Rule 23(b)(3) ........................ 20

  B. Individual issues of fact predominate in respect to the
   elements of each of the claims asserted by Plaintiffs ................. 23

  C. There are significant individual differences that will need to
   be considered to determine exposure, a key element of each
   and every claim and putative class............................................ 28

        1.    *Plaintiffs' hydrogeologic expert concedes that his model will not demonstrate uniformity of exposure, and that individual examinations of exposure will need to be conducted* ................................................ 29

        2.    *Divergent subsurface conditions at the Village will require individualized examinations of conditions, which will prevent uniform treatment of a medical monitoring class* ................................................ 33

    D.    There are significant differences between and among class members with respect to the impact of exposure as well ............. 36

    E.    Individualized issues regarding limitations defenses would also render a class action unmanageable ..................................... 42

    F.    Summary ................................................................................. 45

V.    THE DIFFERENCES BETWEEN AND AMONG CLASS MEMBERS AS TO EXPOSURE AND DAMAGE, COMBINED WITH THE FACT THAT PLAINTIFFS ARE NOT PREDOMINATELY SEEKING INJUNCTIVE RELIEF, ALSO PRECLUDE CERTIFICATION UNDER RULE 23(B)(2) ............................ 46

    A.    Plaintiffs' "injunctive" claims are, in fact, monetary claims; as a result, Rule 23(b)(2) cannot apply ......................................... 46

    B.    There is no cohesive class because of differences in exposure and potential medical consequences ............................. 48

VI.    THE PRESENCE OF MULTIPLE DEFENDANTS THAT ALLEGEDLY RELEASED DIFFERENCE CHEMICALS OVER DIFFERENT TIME PERIODS FURTHER UNDERMINES PLAINTIFFS' BID FOR CLASS CERTIFICATION ......... 50

    A.    Plaintiffs cannot satisfy the typicality requirement of Rule 23(a) because of the differences between the named Plaintiffs and the rest of the putative classes as to exposure ....... 51

    B.    The presence of multiple Defendants demonstrates that there is no single course of conduct alleged ................................. 52

CONCLUSION ................................................................................................. 53

## TABLE OF AUTHORITIES

Page

### FEDERAL CASES

*Amchem Products Inc. v. Windsor*, 521 U.S. 591 (1997) .................................. 1, 20, 23, 49

*Arch v. Am. Tobacco Co.*, 175 F.R.D. 469, 487 (E.D. Pa. 1997) ..................................... 26

*Ball v. Union Carbide Corp.*, 385 F.3d 713 (6th Cir. 2004)..................... 20, 21, 23, 51, 52

*Barnes v. America Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998) .............. 1, 5, 15, 46, 48, 49

*Blain v. Smithkline Beecham Corp*, --- F.R.D. ---,
    2007 WL 178564 (E.D. Pa., January 25, 2007) ........................................... 1

*Blaz v. Galen Hosp. Illinois, Inc.*, 168 F.R.D. 621 (N.D. Ill. 1996) ................................ 51

*Church v. General Electric Co.*, 138 F.Supp.2d 169 (D. Mass. 2001) ...................... 15, 27

*Citizens Concerned About Our Children v. School Bd. of Broward County*,
    193 F.3d 1285 (11th Cir. 1999) ................................................................. 16

*Corley v. Entergy Corp.*, 220 F.R.D. 478 (E.D. Tex. 2004)............................................. 42

*Dawson v. Dovenmuehle Mortgage, Inc.*, 214 F.R.D. 196 (E.D. Pa. 2003) ..................... 28

*Day v. NLO, Inc.*, 144 F.R.D. 330 (S.D. Ohio)................................................................. 48

*Eisen v. Carlisle and Jacquelin*, 417 U.S. 156 (1974)...................................................... 16

*Fabricant v. Sears Roebuck*, 202 F.R.D. 306 (S.D. Fla. 2001) ........................................ 15

*Fisher v. Ciba Specialty Chems. Corp*, 238 F.R.D. 273 (S.D. Ala. 2006) ....................... 15

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995)........................................................................ 14

*General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147 (1982)................................. 14

*Georgine v. Amchem Prod., Inc.*, 83 F.3d 610 (3d Cir. 1996)................... 1, 14, 15, 20, 21

*Hurd v. Monsanto Co.*, 164 F.R.D. 234 (S.D. Ind. 1995)................................................. 15

*Johnston v. HBO Film Management, Inc.*, 265 F.3d 178 (3d Cir. 2001)............................ 1

*LaBauve v. Olin Corp.*, 231 F.R.D. 632 (S.D. Ala. 2005)............ 15, 17, 23, 25, 27, 42, 44

*Martin v. Shell Oil Co.*, 198 F.R.D. 580 (D. Conn. 2000) .................................... 15, 26, 28

*Mest v. Cabot Corp.*, 449 F.3d 502 (3d Cir. 2006) ........................................... 43

*In re Methyl Tertiary Butyl Ether ("MBTE") Products
    Liability Litig.*, 457 F. Supp. 298 (S.D.N.Y. 2006) .................................... 18

*Nelson v. Greenspan*, 163 F.Supp.2d 12 (D.D.C. 2001) ...................................... 16

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154
    (3d Cir. 2001) ...................................................................... 15

*Newton v. Southern Wood Piedmont Co.*, 163 F.R.D. 625 (S.D. Ga. 1995) ............... 15, 19

*O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404 (C.D. Cal. 2000) ..................... 42

*Paige v. California*, 291 F.3d 1141 (9th Cir. 2002) .......................................... 16

*Powell v. First Republic Bank*, 274 F.Supp.2d 660 (E.D. Pa. 2003) ................. 43

*Public Interest Research Group of N.J., Inc.  v. Magnesium Elektron, Inc.*,
    123 F.3d 111 (3d Cir. 1997) ........................................................ 18

*Reilly v. Gould*, 965 F.Supp. 588 (M.D. Pa. 1997) .................................... 15, 51

*In re Sch. Asbestos Litig.*, 56 F.3d 515 (3d Cir. 1995) ...................................... 14

*Steering Committee v. Exxon Mobil  Corp.*, 461 F.3d 598  (5th Cir. 2006) .............. 15, 27

*Sun Oil Co. v. Wortman*, 486 U.S. 717 (1998) ................................................ 43

*Taliaferro v. Darby Tp. Zoning Bd.*, 458 F.3d 181 (3d Cir. 2006) ..................... 17

*Thomas v. FAG Bearings Corp. Inc.*, 846 F.Supp. 1400
    (W.D. Mo. 1994) ................................................... 4, 22, 23, 29, 31, 47, 48

*Tri-County Business Campus Joint Venture v. Clow Corp.*,
    792 F.Supp. 984 (E.D. Pa. 1992) ................................................. 44

*United States v. Hays*, 515 U.S. 737 (1995) .................................................. 17

*Zimmerman v. HBO Affiliate Group*, 834 F.2d 1163 (3d Cir. 1987) ................. 16

## STATE CASES

*Boyd v. Rockwood Area Sch. District,* 907 A.2d 1157 (Pa. Cmwlth. 2006)....................26

*Cangemi v. Advocate South Suburban Hospital*, 845 N.E.2d 792
    (Ill. App. Ct. 2006).................................................................................26

*Commerce Bank/Pa. v. First Union National Bank*, 911 A.2d 133
    (Pa. Super. 2006)..................................................................................25

*Drelles v. Manufacturers Life Insurance Co.*, 881 A.2d 822 (Pa. Super. 2005) ..............44

*Dumm v. Dahl*, 913 A.2d 863 (Pa. Super. 2006) ........................................................25

*Jones v. Wagner*, 624 A.2d 166 (Pa. Super. 1993) ....................................................24

*Kennedy v. Medtronic, Inc.*, 851 N.E.2d 778 (Ill. App. Ct. 2006)...................................25

*Kingston Coal Co. v. Felton Mining Co., Inc.*, 690 A.2d 284
    (Pa. Super. 1997)..................................................................................43

*Kirk v. Michael Reese Hospital & Medical Ctr..*, 513 N.E.2d 387 (1987)......................25

*Millers Mut. Inc. Ass'n of Illinois v. Graham Oil Co.*,
    668 N.E.2d 223 (Ill. App. 2 Dist. 1996) ................................................24

*Schiller v. Mitchell*, 828 N.E.2d 323 (Ill. App. 2 Dist. 2005)...........................................25

*Stewart v. Thrasher*, 610 N.E.2d 799 (Ill. App. 4 Dist. 1993).........................................26

## DOCKETED CASES

*Cutting Edge Sports, Inc. v. Bene-Marc, Inc., No. 01823*, 2006 WL 1492452 ...............46

*Daniels v. Baritz*, No. Civ. A 02-7929, 2004 WL 1699124
    (E.D. Pa. July 29, 2004) ........................................................................15

*Matjastic v. Quantum Pharmics, Ltd.*, Civ. A. No. 90-0647, 1991 WL 238304..............26

*Monaco v. Mitsubishi Motors Credit of America, Inc.*,
    No. 01-3700, 2002 WL 549475, 34 Fed. Appx. 43 (3d Cir. 2002) ...........16

*Snow v. Atofina Chemicals, Inc.*, No. 01-72648,
    2006 WL 1008002 (E.D. Mich. 2006).............................................15, 27

*Satsky v. Paramount Commc'ns Ins., Inc.*, 1996 WL 1062376 (D. Colo. 1996)........25, 28

*Strain v. Nutri/System, Inc.*, No. Civ. A 90-2772,
1990 WL 209325 (E.D. Pa. Dec. 12, 1990) ................................................................ 28

## FEDERAL STATUTES

Fed. R. Civ. P. 23 ..................................................................................................*passim*

## STATE STATUTES

42 Pa. Stat. Ann. § 5521 .............................................................................................. 43

42 Pa. Stat. Ann. § 5524 .............................................................................................. 43

# INTRODUCTION

Pursuant to Rule 23, a motion for class certification can only be granted when the proposed class representative can make a substantive showing that there are questions of law or fact common to all class members that predominate over those that must be determined on an individual basis. *Barnes v. Am. Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998); *Georgine v. Amchem Prod., Inc.*, 83 F.3d 610, 625 (3d Cir. 1996), *aff'd sub nom Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997); *Blain v. Smithkline Beecham Corp.*, --- F.R.D. ---, 2007 WL 178564 (E.D. Pa., January 25, 2007). In other words, it is the **differences** between and among putative class members, and the need to examine such differences to determine either liability or damages, that determines whether a case should proceed as a class action. *See, e.g., Amchem Products, Inc.*, 521 U.S. at 623-25; *Johnston v. HBO Film Management, Inc.*, 265 F.3d 178, 194 (3d Cir. 2001).

In this case, Plaintiffs allege that a number of chemicals allegedly released by two manufacturing facilities located in Ringwood, Illinois – Rohm and Haas[1] (a chemical manufacturer) and Modine Manufacturing Company ("Modine") (**not** a chemical manufacturer, but rather a manufacturer of sophisticated radiators and cooling systems) – may have migrated to McCullom Lake Village, Illinois over decades of time and may have resulted in certain putative class members being exposed to such chemicals. Plaintiffs sorely need the caveat "may" here because they have not made any legitimate, affirmative showing that chemicals released from either Rohm and Haas or Modine could have, or in fact did, reach any well in McCullom Lake Village. In fact, the record developed in this matter shows that just the opposite is true. For example, thirty-nine

---

[1] In this brief, Modine will collectively refer to Rohm and Haas Company, Rohm and Haas Chemicals LLC, and Morton International Inc. as "Rohm and Haas."

wells have now been tested in McCullom Lake Village, nearly ten percent of all the domestic wells in the Village. Yet **none** show the presence of any of the chemicals at issue in this case. *Infra* at 8-9. Indeed, the fact that the named Plaintiffs' well has not shown the presence of contamination precludes them from acting on behalf of any class as they lack standing to bring their claims. *Infra* at 13-16.

Despite the absence of evidence of present contamination in the wells in McCullom Lake Village, Plaintiffs continue to insist that their experts **may** at some point in the future be able to determine that uniform exposure has occurred and that exposure allegedly **may** cause brain cancer.[2] But these same experts concede that they will need to conduct thousands of individual examinations of class members and their properties in order to determine exposure and any resulting risk. For example:

1.      Greg Hill, the hydrogeologist whose preliminary report Plaintiffs rely upon as "proof" that the classes have been uniformly "exposed" to chemicals from the Ringwood facilities, admitted that individual issues, such as well-depth, will need to be examined to determine whether any chemicals in fact could have reached the properties or persons in question:

> Q.      ....For someone -- under what you are being asked to do, for someone whose well is 55 foot in depth and someone whose well is 294 feet in depth, does it make any difference in your analysis as to whether they were exposed?
>
> MR. FREIWALD:  Objection.  You covered that this morning.  He's answered it already.  You can answer it again.

---

[2] As set forth in Modine's experts' reports, there is no valid connection between the chemicals at issue in this case and any of the cancers that are the subject of this case. (*See, e.g.,* Affidavit of Cristina D. Hernandez-Malaby, Ex. A at 6-17; *see also* General Causation Opinions in *Gates et al v. Rohm and Haas Company, et al*, Darrell D Bigner, M.D. PhD (January 26, 2007) at 6, 31-38, 64 ("In my opinion, vinyl chloride has not been demonstrated to be an animal or human primary brain tumor carcinogen...."), submitted as part of the Rohm and Haas Opposition.)

THE WITNESS:  Well, the groundwater modeling is going to take into account the pathways of various depths as groundwater approaches McCullom Lake Village.

BY MR. WELLINGTON:

Q.  Does that mean it may or may not or they're all going to be the same?

A.  No.  As I said before, I don't know at this point.  **But it's certainly is possible that there will be differing levels of contamination in a shallower well as opposed to a deeper well.**  That's yet to be determined.

(Hernandez-Malaby Aff., Ex. B at 144-145) (emphasis added); *see also* Exhibit 1.

2.      Dr. Gary Ginsberg, the toxicologist whose report is relied upon by Plaintiffs as purported proof that risks associated with exposure can be determined on a class-wide basis, admits that each individual class member's exposure would in fact need to be examined to determine the propensity for cancer to develop.  (Hernandez-Malaby Aff., Ex. C at 81-83.)  Dr. Ginsberg further conceded that there are differences in how each individual processes metabolizes the chemicals in question, which would impact the "risk" of such person developing cancer in the future:

Q.      There is individual differences amongst people on how they, I guess we will call it process vinyl chloride into a potentially carcinogenic agent?

MR. FREIWALD:  Objection.

BY MR. BARTEL:

Q.      Right?

A.      That is correct.  There are individual differences.

(*Id.* at 30-31; *see also* Hernandez-Malaby Aff., Ex. A at 24-25) ("Humans vary in their responses to toxins and in their sensitivity to a particular dose.  Thus it is imperative that the risk of toxic reactions needs to be considered on a case-by-

case basis to account for individual differences in exposures and individual differences in sensitivity to chemicals.")).

    3.  Dr. Richard Neugebauer, the supposed epidemiologist whose preliminary assessment Plaintiffs rely upon as "proof" that there is an unusually high rate of "brain cancer" in McCullom Lake Village, and thus increased "risk" of developing cancer, admitted that he will need to examine individual medical histories as a part of his study to determine whether any cancer in a McCullom Lake Village resident might be related to an exposure from Defendants:

> Q. To say whether or not a particular cancer would be associated with an exposure, you can't do that because there is issues of past medical history and familial history of the patient, correct?
>
> A. No, that would be the subject of a future study as part of the future investigation.
>
> Q. And the past medical history and familial history of a patient to see if there is a connection are critical details, are they not as to those whether or not a specific person cancer is associated, the past medical history and familial history of that person is critical, is it not?
>
> A. It is important.
>
> …..
>
> Q. And knowing whether the specific individuals had specific exposures to other chemicals that might be associated with these types of brain cancers is important, correct?
>
> A. Correct.

(Hernandez-Malaby Aff., Ex. D at 130-131.)

The need to examine these differences and others precludes certification under Rule 23(b)(3), because the individual issues predominate over any putative common issues. *Thomas v. FAG Bearings Corp. Inc.*, 846 F.Supp. 1400, 1404 (W.D. Mo. 1994).

The many differences between and among class members that will need to be considered on issues such as exposure, causation, and damages also precludes certification under Rule 23(b)(2), because there is no "cohesive" class. *Barnes*, 161 F.3d at 143. The depositions of various putative class members confirm that there are many material differences between and among class members which preclude uniform findings on issues such as, for example, the appropriateness of any hypothetical medical monitoring protocol or whether any particular property has been damaged. *Infra* at 43-47. This, combined with the fact that Plaintiffs seek primarily monetary damages, precludes certification under this provision of Rule 23.

Finally, because Plaintiffs have differentiated between Modine and Rohm and Haas with respect to the timing and scope of the alleged releases, as well as the type of chemicals allegedly released, they have failed to satisfy the typicality requirement of Rule 23(a) as to any of Defendants. For example, in the handful of paragraphs of Plaintiffs' Memorandum devoted to Modine, Plaintiffs concede that Modine did not even start using its facility until 1961, some twenty years after manufacturing began at the Rohm and Haas facility, and that any alleged releases by Modine did not happen until the mid-1970s, some thirty-five years after Rohm and Haas' predecessor allegedly began manufacturing chemicals at the Rohm and Haas site. (Pl. Br. at 6). It cannot be said that Plaintiffs' claims – which purport to be against both Rohm and Haas and Modine – are "typical" if each class member could have been exposed to different chemicals from different sources at different times.

In short, in considering Plaintiffs' bid for class certification, this Court must look beyond Plaintiffs' provocative (yet unsupported) allegations to the actual evidentiary

record developed by the parties and their experts, a record which amply illustrates how inappropriate class treatment would be in this case. What the record demonstrates is that none of the extensive well testing in McCullom Lake Village detected any of the asserted contaminants – the named Plaintiffs even have failed to show exposure at their well. The record also shows that any analysis of exposure or assessment of risk therefrom necessarily involves profoundly individualized inquiries. Even the allegations against Defendants vary significantly. Plaintiffs' certification bid is built upon nothing more than conjecture, surmise, and the hope that future expert models may show broad former contamination and exposure in the Village. This is not enough to support certification.

## BACKGROUND

### I.   THE RINGWOOD FACILITIES.

Founded in 1916 in Racine, Wisconsin, Modine is a worldwide leader in thermal management that designs, engineers, tests, and manufactures heat transfer products, such as sophisticated radiators and cooling systems, for a wide range of applications and markets. (Hernandez-Malaby Aff., Ex. E.) Modine has operated a facility in Ringwood, Illinois since 1961, where it manufactures cooling monitors, condensers, evaporators, and oil coolers. (Pl. Br. at 19; Hernandez-Malaby Aff., Ex. F.)

In 1990, Modine discovered that the groundwater beneath its facility contained certain volatile organic compounds. At that time, the company began conducting groundwater monitoring to determine the source and extent of the groundwater contamination. It voluntarily enrolled the property in the Illinois EPA's Voluntary Remediation Program. The activities it has done to assess the source and extent of the contamination has been done under the auspices of the Voluntary Remediation Program.

Rohm & Haas operates a chemical manufacturing plant in Ringwood.  The Rohm
& Haas plant has been operated by it or one of its predecessors at least since the 1940s.
(P. Br. at 6).  The Rohm & Haas plant property adjoins the Modine property to the north,
east and southeast.

## II.    SUMMARY OF PLAINTIFFS' ALLEGATIONS.

McCullom Lake Village ("the Village") is located more than 8000 feet (*i.e.* more
than a mile and a quarter) south of the Ringwood plants.  The Amended Complaint
alleges that the domestic wells of the Village's residents have been contaminated by three
chemicals – trichloroethene ("TCE"); 1,1-dichloroethene ("1,1- DCE"); and vinyl
chloride ("chemicals of concern" or "COCs") – and that the contaminated groundwater
originated at the Ringwood plants.  (Am. Cmplt. ¶ 1.)  Plaintiffs also allege that the
COCs are carcinogens that cause brain cancer, and that several persons either currently or
formerly living in or near the Village have been diagnosed with brain cancer within the
last few years.  (Am. Cmplt. ¶¶ 1, 60.)

But Plaintiffs do **not** allege that there was a single act or course of conduct that
resulted in the alleged contamination or alleged injuries.  In fact, Plaintiffs' allegations
against Modine differ in significant ways from those concerning Rohm and Haas.  For
example:

- Plaintiffs allege that Modine released chemicals in a disposal pit
  and underground storage tanks. (Pl. Br. at 19.) In contrast, the
  alleged releases at the Rohm and Haas plant – which Plaintiffs
  claims were of significant size – occurred in a large lagoon and in
  certain accidental releases. (Pl. Br. 6-16.) The size difference
  between the lagoon and the Modine disposal pit is illustrated by
  the chart attached as Exhibit 2, which was marked by a witness
  after being asked by Plaintiffs' counsel to illustrate the location of
  the Modine disposal site.

- Plaintiffs allege that the releases from Modine occurred in the 1970s and 1980s. (Pl. Br at 19.) In contrast, according to Plaintiffs, the alleged releases at the Rohm and Haas facility occurred over several decades prior. (Pl. Br. at 6.)

- Plaintiffs allege that Modine released naptha, toluene, 1,1,1-trichloroethane and tricholorethene ("TCE") (Pl. Br. at 19), and benzene at its facility (Pl. Br. at 20). In contrast, Plaintiffs allege that the chemicals allegedly released at the Rohm and Haas facility included 1,1-DCE (Pl. Br. at 6, 10, 15, 16), dichloropropane/dichloropropene (Pl. Br. at 9, 10), vinyl chloride ("VC") (Pl. Br. at 10), and benzene (Pl. Br. at 11).

As a result of this alleged contamination, Plaintiffs allege that both they and the alleged members of the putative classes have suffered the following supposedly common injuries: (1) the increased risk of developing brain cancer as a result of the alleged contamination of the members via groundwater wells or air transport;[3] (2) the cost and expense incurred in responding to the contamination of the wells, and (3) impairment of the value of the putative class members' property.

**III.    THE ABSENCE OF EVIDENCE OF CONTAMINATION IN THE VILLAGE.**

Notably, **none** of the chemicals allegedly released by the Defendants, particularly the "chemicals of concern," have appeared in any of the well tests conducted in the Village. Village wells have been tested in three testing events over the past year:

- In May 2006, the McHenry County Health Department ["Health Department"] conducted well testing at nine houses. The Health Department's testing did not detect any of the COCs alleged by the

---

[3] Plaintiffs allege that Rohm & Haas caused "air contamination" by the operation of a groundwater treatment system known as an air stripper. (Pl. Br. at 15.) They attach a report of Dr. Paolo Zannetti, an environmental scientist, who states that "this case can be further examined . . . to assess the air pollution impact at the plaintiffs' locations caused by the emissions of the defendants." (Pl. Br., Ex. B at 3.) This is pure conjecture, as the Zannetti statement does not state that any exposure from any air emission has occurred. Moreover, Plaintiffs have made no allegation whatsoever that Modine caused air emissions or air pollution.

Plaintiffs to have contaminated the Village wells. (Report of Richard J. Roddewig at 7, submitted as part of the Rohm and Haas Opposition.)[4]

- In April 2006, Plaintiffs' attorneys conducted their own well testing at six different properties, including the property of the named Plaintiffs. The testing done by Plaintiffs' attorneys revealed no contamination by COCs in any of the wells, including the well of the named Plaintiffs. (Hernandez-Malaby Aff., Ex. B at 61, 66 and 148.)

- In January 2007, Plaintiffs' attorneys tested twenty-four additional wells in the Village.  Not one of the COCs was detected in any of the twenty-four wells tested by Plaintiffs' attorneys.  (Hernandez-Malaby Aff., Ex. G and I.)

Plaintiffs' expert J. Gregory Hill nonetheless hypothesizes that chemicals recently detected in a few wells in the Village – in particular, chloride and ammonia – somehow demonstrate that chemicals have migrated from Ringwood to the Village.  (Hernandez-Malaby Aff., Ex. H.)  Not only is this conclusion without scientific basis and contrary to the actual test results, it indisputably has nothing to do with Modine.  The only statement made by Plaintiffs' expert as to the source of chloride and ammonia is that these chemicals may have emanated from the Rohm and Haas plant.  (*Id.* at 1.)  This hypothesis is based on the expert's belief that chloride and ammonia were found at the Rohm and Haas plant.  (*Id.* at 1-2.)  Chloride and ammonia, however, are common chemicals which appear in products such as road salt (which is used in the Village) and water softeners.[5]  (Hernandez-Malaby Aff., Ex. I at 2.)  There is nothing to suggest that Modine impacted levels of chloride or ammonia in domestic wells in the Village.  (*Id.* at

---

[4]  Eight of the nine samples did not detect any volatile organic chemicals whatsoever.  One well detected a trace concentration of TCA, a non-carcinogen found in common household products including septic system cleaners.  (Roddewig Report at 7.)  The concentration was two orders of magnitude below the Maximum Contaminant Level, or MCL, under the Safe Drinking Water Act. The Health Department re-tested the well and obtained a similar result. TCA is not one of the COCs.

[5]  The area surrounding the Village is agricultural; ammonia could have also emanated from the farming activities in such area, including from feed lots and fertilizer.

1.) Plaintiffs' expert also fails to explain how certain chemicals from Rohm and Haas could somehow have traveled more than a mile to the Village while others have not.

IV.    THE DIFFERING SUBSURFACE CONDITIONS IN THE VILLAGE.

As noted above, the Village itself is more than a mile south of the Ringwood plants. (Roddewig Report at 6.) Some 465 properties located in eight neighborhoods over 178 acres comprise the Village, which has considerable variation in zoning, land use, and socioeconomic characteristics. (*Id.* at 3.) A total of 409 properties are residential and are serviced by domestic wells and all these properties, until very recently, were using septic systems, with some properties now hooking into a municipal sewer system. (*Id.* at 9.)

The domestic wells draw water for potable use from one of several aquifers underlying the Village. The subsurface in the area of the Village was characterized as part of a larger geologic and hydrogeological study of McHenry County by S.C. Meyer under a contract with the Illinois State Water Survey, published in 1998. (Hernandez-Malaby Aff., Ex. J at 3 and 7.) Meyer identified five aquifers in McHenry County, no less than three of which are present in the vicinity of the Village. (*Id .*at 4-5.) "Aquifer 1" (as denoted by Meyer and the hydrogeologists in this case) is the most shallow of the aquifers, extending from the ground surface to an approximate depth of 70 feet. "Aquifer 5" is the deepest of the water bearing zones, overlying the bedrock at depths exceeding 200 feet. (*Id.* at 4.) Separating the two aquifers is a clay layer which retards the ability of groundwater (or any of its constituents) from migrating from one aquifer to the other, at least in the northern and western portions of the Village. (*Id.* at 4.) Residential wells in the Village were installed at varying times and vary in terms of their construction

techniques, construction materials, depth, and the geologic formation in which they were set.  (*Id.* at 5-6.)

V.      THE INDIVIDUALIZED NATURE OF CONTAMINATION AND EXPOSURE
        DETERMINATIONS.

While Plaintiffs contend that questions pertaining to contamination and exposure are common to their entire asserted classes, the class certification evidentiary record is completely to the contrary.  Indeed, the record establishes that any such determinations by their nature must be individualized.

For example, a basic tenet of toxicology is that potential health effects from exposure to chemicals are in part a function of receiving a sufficient dose of the chemical at issue over a sufficient period of time.  A key question in the event of exposure is whether the duration of the exposure and the "dose" can lead to disease.  (Hernandez-Malaby Aff., Ex. A at 23-24.)  Threshold individual questions will need to be addressed with each alleged member of the asserted classes.

A.      Is there any exposure at all to this individual?

To calculate an increased risk of disease that potentially arises from exposure to a chemical, there must be *some* exposure to produce the calculation. If there are no COCs in an individual's well, no exposure analysis can be done to calculate the incremental risk of disease. (*Id.* at 22; Bigner at 8).  This is of enormous significance in this case where no testing ever done on Village wells has ever shown a detection of the COCs at any concentration.  The well of each alleged member of the putative classes will need to be tested to determine whether the well has been affected at all – i.e. whether there is *any* exposure.

**B.      If there were some exposure, how much, for how long?**

As noted above, dose and duration are key aspects of assessing exposure to chemicals. Thus, if the COCs ever are detected in any Village well, then "dose" and "duration" for each impacted well will need to be assessed. (Hernandez-Malaby Aff., Ex. A at 24.)

Hydrogeologist Frank Rovers reviewed regional hydrogeological information for the area that includes the Village and concluded that even, if a contaminant plume had migrated to the Village (as Plaintiffs have alleged but as to which there is no evidence), individual properties within the Village would have been impacted at different times. (Hernandez-Malaby Aff., Ex. K at 7) Similarly, individuals living in those residences would have been exposed to contaminants in groundwater at different time periods and at different concentrations. (*Id.* at 7.) Plaintiffs' expert, Mr. Hill, concedes as much, for he acknowledged at his deposition that "it's certainly possible that there would be differing levels of contamination [in different putative class members' wells] . . . . That's yet to be determined." (Hernandez-Malaby Aff., Ex. B at 138.) Indeed, Hill makes no claim that his model would show that all class members are being affected in the same way.[6] Thus, even if there were past contamination as alleged, these variations in the time that contamination first impacted wells, and in concentrations in different wells,  are critical in constructing the exposure analysis necessary to assess the risk of disease from exposure to the contamination.

Additional individual exposure factors and sensitivities play into the exposure analysis for conducting a risk assessment, which are highly variable across individuals.

---

[6] Hill does not dispute that an assessment of each household would be necessary to determine the exposure for that particular household. (Hernandez-Malaby Aff., Ex. B at 243-44).

(Hernandez-Malaby Aff., Ex. A at 24-25.)  Among the questions that would inform the
issue of increased risk of disease would include the following: How long (if at all) was
the well  impacted by the COCs?  At what concentrations (if at all) was the well
impacted?  Did the levels in that well change over time?  How long has/did the individual
lived/live in the house?  Did the individual drink the water?  How much water did the
individual drink daily?  Did the amount of water consumed vary over the course of a
year? Over the course of the time the individual lived in the house?

C.    **How has each individual's property been impacted?**

As the Report of Richard Roddewig (an expert in the field of assessing property
damage claims arising in the context of environmental impairment) reflects,[7] there is no
uniform method to measure the two types of impairment to real property alleged by the
Plaintiffs: remediation costs and expenses, and loss of property value. (Roddewig at 17.)
Even if Plaintiffs were able to make any showing of contamination, the type, degree and
duration of impairment to real estate are dependent on a variety of neighborhood-based
real estate factors that can result in widely varying levels of impairment.  Indeed, each of
the 465 properties in the Village – some residential, some commercial, comprising eight
different neighborhoods of differing socioeconomic and land use characteristics – would
have to be independently evaluated.

Moreover, as Roddewig observed, even if a well were impacted, the actions taken
(and the expense in performing such actions) would be factors in assessing monetary
damages or response costs.  Since testing performed to date by both the Health
Department and Plaintiffs has shown no current impact to any of the wells tested to date,
testing of each well in the putative class would be necessary simply to determine whether

---

[7] The Roddewig Report is submitted as part of Rohm and Haas' Opposition.

the well has been impacted.  If any are, then assessing the measures necessary to protect

that well would also need to be accomplished.  The response actions taken and costs

incurred by each alleged member of the putative classes will necessarily vary

dramatically.[8]  The substantial variability in the neighborhoods and properties within the

putative property loss class will necessarily result in widely varying market reactions to

the alleged contamination.

## ARGUMENT

I.   **PLAINTIFFS CANNOT SATISFY THEIR HEAVY BURDEN OF DEMONSTRATING THAT CLASS CERTIFICATION IS APPROPRIATE IN THIS MASS TORT ACTION.**

Plaintiffs ask this Court to certify four classes of plaintiffs – a "medical

monitoring" class, a "property loss" class, an "injunctive relief" class, and a "punitive

damages" class.  As the parties advocating class certification, Plaintiffs here bear the

burden of proving that their myriad asserted classes and numerous purported claims are

appropriate for class treatment.  *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,

55 F.3d 768, 792 (3d Cir. 1995), *cert. denied*, 516 U.S. 524 (1995).  To meet this burden,

Plaintiffs must demonstrate that they satisfy all of the prerequisites to a class action

identified in Rule 23(a) (numerosity, commonality, typicality, and adequacy), and one or

more subsections of Rule 23(b).  *Georgine*, 83 F.3d at 624.  In addition, Plaintiffs must

satisfy other implicit, threshold requirements for certification well recognized under the

law, including that they are members of their asserted classes with standing to assert the

purported class claims, *see General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147,

159-61 (1982), and that the class is properly defined and presently ascertainable.  *See In*

---

[8] Testing of individual wells would also be necessary to determine what damages or remedial action would be necessary.  Well construction details and well depth might all influence the type of cleanup or action to protect the well.

*re Sch. Asbestos Litig.*, 56 F.3d 515, 519 (3d Cir. 1995); *Daniels v. Bartz*, No. Civ. A 02-7929, 2004 WL 1699124, at *1 (E.D. Pa. July 29, 2004); *Fabricant v. Sears Roebuck*, 202 F.R.D. 306, 308 (S.D. Fla. 2001).

These collective burdens are especially difficult to satisfy in mass tort and alleged environmental contamination circumstances, as demonstrated in the many decisions in which courts have denied class certification.[9] "Mass accident" cases are inherently insusceptible of class treatment "because of the likelihood that significant questions, not only of damage but of liability and defenses to liability, would be present, affecting individuals in different ways." *Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598, 604 (5th Cir. 2006) (quoting Advisory Committee Notes to Rule 23).

Plaintiffs cannot meet their burden merely on the basis of unsubstantiated allegations, for often as here it is necessary "to probe behind the surface of Plaintiffs' allegations" to determine whether Rule 23 requirements are met. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 165 (3d Cir. 2001) (*quoting Falcon*,

---

[9] *See, e.g., Georgine, Inc.,* 83 F.3d at 627-630 (class certification denied in alleged asbestos exposure and medical monitoring case); *Barnes,* 161 F.3d at 143-47 (class certification denied in mass products liability and medical monitoring case ); *Steering Comm.,* 461 F.3d at 603-604 (class certification denied in alleged air contamination case); *Fisher v. Ciba Specialty Chems. Corp,* 238 F.R.D. 273, 305 (S.D. Ala. 2006) (class certification denied in alleged air and groundwater contamination case); *Snow v. Atofina Chems., Inc.,* No. 01-72648, 2006 WL 1008002, at *8-9 (E.D. Mich. Mar. 31, 2006) (class certification denied in medical monitoring case); *LaBauve v. Olin Corp.,* 231 F.R.D. 632, 673 (S.D. Ala. 2005) (class certification denied in alleged groundwater contamination case); *Church v. General Elec. Co.,* 138 F.Supp.2d 169, 181-82 (D. Mass. 2001) (class certification denied in alleged soil and groundwater contamination case); *Martin v. Shell Oil Co.,* 198 F.R.D. 580, 592-93 (D. Conn. 2000) (class certification denied in alleged groundwater contamination case); *Reilly v. Gould, Inc.,* 965 F. Supp. 588, 598 (M.D. Pa. 1997) (class certification denied in air and groundwater contamination and medical monitoring case); *Satsky v. Paramount Communc'ns, Inc.,* No. Civ.A. 90-S-1561, 1996 WL 1062376, at *13-16 (D. Colo. Mar. 13, 1996) (class certification denied in alleged medical monitoring and groundwater contamination case); *Newton v. Southern Wood Piedmont Co.,* 163 F.R.D. 625, 632 (S.D. Ga. 1995), *aff'd,* 95 F.3d 59 (11th Cir. 1996) (class certification denied in soil, air, groundwater contamination and medical monitoring case); *Hurd v. Monsanto Co.,* 164 F.R.D. 234, 239 (S.D. Ind. 1995) (class certification denied in mass products liability and toxic tort case).

457 U.S. at 160). That involves "a preliminary inquiry into the merits . . . to determine whether the alleged claims can be properly resolved as a class action." *Id.* at 166 (*quoting Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974)). Plaintiffs here plainly cannot meet their certification burdens with respect to any of their asserted classes.

II.     **PLAINTIFFS CANNOT SATISFY THE IMPLICIT THRESHOLD REQUIREMENTS FOR CLASS CERTIFICATION.**

  A. **The named Plaintiffs lack standing to bring the claims alleged in the Amended Complaint and therefore cannot act as class representatives.**

   Plaintiffs' Motion fails at the outset because the named Plaintiffs themselves are not members of their asserted classes, and therefore lack standing to bring the asserted class claims in their own right. *See, e.g., Falcon*, 457 U.S. at 159-61 (decertifying a class composed of employees complaining of discrimination in defendant's hiring and promotion practices where the named plaintiff did not have standing to make a discriminatory hiring claim). This is because there is no evidence the Plaintiffs or their property has ever been exposed to the COCs, and in fact there is evidence to the contrary.

   As the Third Circuit has noted, a plaintiff simply cannot assert claims on behalf of a class if that plaintiff lacks individual standing to assert those claims in his or her own right: "It is well settled that 'to be a class representative on a particular claim, the plaintiff himself must have a cause of action on that claim.'" *Monaco v. Mitsubishi Motors Credit of Am., Inc.*, No. 01-3700, 2002 WL 549475, at **2, 34 Fed. Appx. 43, 45 (3d Cir. Apr. 12, 2002) (*quoting Zimmerman v. HBO Affiliate Group*, 834 F.2d 1163, 1169 (3d Cir. 1987)); *see also Paige v. California*, 291 F.3d 1141, 1146-47 (9th Cir. 2002), *cert. denied*, 537 U.S. 1189 (2003); *Citizens Concerned About Our Children v. School Bd. of*

*Broward County*, 193 F.3d 1285, 1290 (11th Cir. 1999); *Nelson v. Greenspan*, 163

F.Supp.2d 12, 19 (D.D.C. 2001).

To satisfy the "irreducible constitutional minimum of standing," Plaintiffs "must

have suffered an injury in fact – an invasion of a legally protected interest which is (a)

concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical";

"there must be a causal connection between the injury and the conduct complained of";

and "it must be likely, as opposed to merely speculative, that the injury will be redressed

by a favorable decision." *Taliaferro v. Darby Tp. Zoning Bd.*, 458 F.3d 181, 188 (3d Cir.

2006) (*citing United States v. Hays*, 515 U.S. 737, 742-43 (1995)).

Here, the named Plaintiffs have not demonstrated any "actual injury" nor

provided any other evidence of present or "imminent" harm.  While exposure to the

COCs is a defining criteria of the classes Plaintiffs seek to represent (Pl. Br. at 25-26),

Plaintiffs have not made any showing of present exposure to or contamination from the

COCs.  Nor could they, because testing done of the named Plaintiffs' well reflects an

utter absence of the COCs, as has every other well test conducted in the Village to date.

Plaintiffs' speculation about the "subsequent migration" of chemicals from Defendants'

facilities (Am. Cmplt. ¶ 64), when no proof of the COCs' presence on Plaintiffs' property

has been offered, also cannot establish a basis for medical monitoring, injunctive relief,

or compensation for property-related losses, let alone punitive damages.  Plaintiffs thus

lack standing to advance any claim on behalf of any putative class.

Faced with similar tort claims and remarkably similar kinds of evidence, the

district court in *LaBauve v. Olin Corp.*, 231 F.R.D. 632 (S.D. Ala. 2005), concluded that

a majority of the named plaintiffs had failed to show injury sufficient to establish

standing to assert claims on behalf of the alleged classes.  In that case, homeowners residing near a chemical plant claimed that mercury released from the site had contaminated their property via air and water, thereby adversely affecting property values and giving rise to claims for negligence, nuisance, trespass, strict liability, and violations of CERCLA.  *Id.* at 636-40.  Although plaintiffs proffered a number of theories about how mercury **could** reach their property, all but one of them had test results showing no unusual levels of mercury on their property and no tests indicated that the levels of mercury on their property would be likely to vary significantly over time.  *Id.* at 649-50.  The court therefore concluded, "plaintiffs have not shown that [their] properties are actually injured at this time, or that any future harm to them is imminent or immediate."  *Id.* at 650.  To the contrary, the property damage the plaintiffs alleged was "exactly the kind of conjectural or hypothetical injury that courts routinely deem insufficient to satisfy the injury-in-fact requirement or to confer standing."  *Id.*[10]

The injury standard articulated by the Third Circuit is no different: "When a plaintiff claims that a defendant's **threatened injury** is the source of his standing, he must show that the threatened injury is so imminent as to be 'certainly impending.'  [citation omitted]  The imminence requirement ensures that courts do not entertain suits based on speculative or hypothetical harms."  *Public Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 122 (3d Cir. 1997) (emphasis added).

---

[10] *Cf. In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 457 F.Supp.2d 298, 305-07 (S.D.N.Y. 2006) (finding that plaintiffs had standing where the wells on adjacent properties east and west of them had tested positive for contaminants, more than 350 residential wells within a two-mile radius of the alleged polluter had tested positive, and plaintiffs' well drew from the same aquifer as the alleged polluter).  Here, Plaintiffs have adduced no such evidence from their neighbors' wells.

In light of the named Plaintiffs' inability to offer any evidence that chemicals from Defendants' facilities have reached their well or any other part of their property, this Court should similarly find that Plaintiffs lack standing.

**B.      Plaintiffs' classes are not ascertainable and therefore cannot be certified.**

Plaintiffs' myriad asserted class definitions also all fail from the outset because they are not "precise, objective, and presently ascertainable" and because each would improperly require a mini-hearing just to determine class membership. *Daniel v. Baritz*, 2004 WL 1699124, at *1-2 (E.D. Pa. 2004).  For instance, membership in Plaintiffs' asserted "medical monitoring" class turns on whether current or former Village residents were "**exposed to** TCE, 1, 1-DCE and/or vinyl chloride originating from defendants' properties."  Plaintiffs' asserted "property loss" class has similar non-objective, liability-dependent definitional criteria, specifically Village property owners "who incurred or will incur remediation costs or loss of property value **due to exposure**" to the aforementioned chemicals.  These asserted class definitions – predicated upon a future, subjective and individualized exposure determination – are ill-suited for class adjudication and uncertifiable as a matter of law.  *See, e.g. Newton*, 163 F.R.D. at 632 (proposed definition of class to include people who had been exposed to chemicals from wood treatment plant and experienced keratoses was too vague and not capable of objective definition), *aff'd*, 95 F.3d 59 (11th Cir. 1996).[11]

---

[11] To avoid burdening the Court with redundant arguments, Modine hereby adopts and incorporates Argument Section I from the Rohm and Haas Opposition.

III.    **PLAINTIFFS' CLASSES DO NOT MEET THE PREREQUISITES OF RULE 23(A), SPECIFICALLY COMMONALITY, TYPICALITY, AND ADEQUACY.**

For the reasons stated in the Rohm and Haas Opposition Brief, Plaintiffs have also failed to satisfy the prerequisites to class certification recited in Rule 23(a), including particularly the commonality, typicality, and adequacy requirements. In addition, because Plaintiffs have joined different Defendants against whom they have alleged different conduct over different times, they cannot establish typicality. (*See infra* at Section VI.)

IV.    **THE INDIVIDUAL DIFFERENCES THAT WILL NEED TO BE EXAMINED TO DETERMINE EXPOSURE AND RISK PRECLUDE CERTIFICATION UNDER RULE 23(B)(3).**

Each argument raised in this Brief and in Rohm and Haas' Opposition is focused on the remarkable number of differences that will need to be examined to determine almost every element of Plaintiffs' claims. These differences preclude certification under many legal arguments, but most obviously pursuant to Rule 23(b)(3).

A.    **The predominance requirement of Rule 23(b)(3).**

In order to certify a class under Rule 23(b)(3), this Court must find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." The predominance requirement of Rule 23(b)(3), while similar to the commonality requirement of Rule 23(a), is a "far more demanding" standard because it "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623-24; *see also Ball v. Union Carbide Corp.*, 385 F.3d 713 (6th Cir. 2004).

The proliferation of individual considerations in cases alleging exposure to toxic chemicals, particularly when such exposure occurred over a period of time and from

more than one chemical "release," have led courts in this circuit and others to deny

certification to classes alleging such exposure.  For example, in *Georgine v. Amchem*

*Products, Inc., supra* – a case completely ignored by Plaintiffs – the court denied class

certification pursuant to Fed. R. Civ. P. 23(b)(3) **despite the fact that defendants had**

**stipulated to certification** because plaintiffs had too many individual differences

complicating their claim.  There, plaintiffs sought to certify classes of individuals who

had been exposed to asbestos and were either currently ill or had no physical ailments.

*Georgine,* 83 F.3d 610.  The court held that significant factual differences among the

plaintiffs – such as their exposure to asbestos and medical histories – would lead to

disparate applications of legal rules, including those concerning causation, comparative

fault, and damages available to each plaintiff.  *Id*. at 627.  Given these and other

differences, the limited common issue of the harmfulness of asbestos could not satisfy the

predominance requirement of Rule 23(b).  *Id*. at 630.

     The Sixth Circuit reached the same conclusion in *Ball v. Union Carbide*, *supra*, a

case involving alleged long-term exposure to radioactive and other toxic substances

resulting from the manufacture of nuclear weapons by several companies.  385 F.3d at

717.  In that case, plaintiffs sought to certify classes of persons who had not yet

contracted thyroid cancer, but who allegedly were exposed and put at risk by defendants'

acts.  The district court held that the classes could not be certified because any common

questions did not "predominate over the innumerable individualized questions that would

exist with respect to each plaintiff."  *Id.* at 727.

> Each member of the proposed class lived in Scarboro for a
> discrete period of time and was exposed to mercury or
> other toxins in a discrete way.  Some may have lived there
> for fifty or more years and some for a week or less.  Some

> were there in the late 1950s when emissions were greatest
> and some were not. A few may have consumed milk from
> a backyard farm animal in the 1950s, most did not. As in
> *Heiser* [a companion case], each individual plaintiff, if he
> or she has a claim, has a highly individualized claim based
> on his or her total exposure time, exposure period, medical
> history, diet, sex, age, and a myriad of other factors. The
> court finds that the individualized issues far outweigh any
> common ones.

*Id.* The Sixth Circuit upheld this decision, finding that "by seeking medical monitoring

and environmental cleanup of property, Plaintiffs have raised individualized issues." *Id.*

The court also held that the district court's examination of predominance was correct:

> Plaintiffs additionally charge that the district court should
> not have used the term "predominance" found in Rule
> 23(b)(3) in its analysis of commonality and typicality.
> However, 'the predominance requirement of Rule 23(b)(3)
> [has been found] similar to the requirement of Rule
> 23(a)(3).' As any claim the class may have had in common
> threatened to splinter into individualized claims, it was not
> error for the district court to refer to the fact that Plaintiffs'
> individualized claims predominated over their claims in
> common.

*Id.* at 728 (citation omitted).

The case perhaps most analogous to this one is *Thomas v. FAG Bearings Corp.*

*Inc., supra*, in which plaintiffs alleged that defendant released TCE into the groundwater,

and as a result the putative class was entitled to medical monitoring and damages under

CERCLA. In declining to certify the class, the district court concluded that the complex

question of whether any class member could have been exposed, particularly given the

absence of any positive well tests, precluded certification:

> In the present case, while there are undoubtedly common
> issues of law and fact, such as whether FAG Bearings
> released TCE into the groundwater, the individual issues of
> causation and damage so overshadow those in numerosity
> and complexity to render a class action unhelpful.

> The Court anticipates that plaintiffs' proof of causation, if offered consistently with the Court's February 10, 1994 opinion, will require individualized proof for each plaintiff. **As an example, a test of the well water of nominal plaintiffs …failed to disclose the presence of TCE. Not only does this indicate that their proof of contamination will be different from other plaintiffs, but it underlies the complex nature of hydrogeology.** Because the results vary markedly from well-to-well, expert testimony on the actual source of contamination for each well may be required.

*Thomas*, 846 F.Supp. at 1404 (citation omitted) (emphasis added).

The case presented to this Court falls in the same category as *Amchem, Ball, Thomas,* and the many other cases where courts have refused to certify classes of plaintiffs because the differences between and among putative class members, particularly with respect to the determination of exposure and risk, are so great.

**B.      Individual issues of fact predominate in respect to the elements of each of the claims asserted by Plaintiffs.**

The need to conduct individualized examinations would be required regardless of how Plaintiffs defined their putative classes because common law claims like those asserted here (*e.g.*, trespass, nuisance, negligence, fraud and the like) all have elements that demand inherently individualized inquiries for each alleged member of the putative class.

The most profound of those individualized inquiries relate to particularized determinations of any alleged exposure and the alleged class member-specific assessments of the impact of that exposure. Much of the expert and class certification evidentiary record has been focused on these two  particular sets of individualized issues, which are discussed at length below at Sections C and D.

But individual questions abound as to other elements of Plaintiffs' claims as well. An especially instructive case is *LaBauve v. Olin Corp.*, 231 F.R.D. 632 (S.D. Ala. 2005). There, faced with remarkably similar facts and claims, the court found that, notwithstanding the presence of certain arguably common factual issues among all members of the proposed class (*e.g.*, the question of whether defendants actually released the alleged harmful chemicals), **multiple** elements of Plaintiffs' trespass, nuisance, fraud and other claims required individualized treatment, thereby rendering class treatment impracticable. *Id.* at 673-74 (noting, for example, that plaintiff-by-plaintiff analysis was required to determine whether a particular plaintiff's property had been contaminated, the specific source and extent of any contamination, the degree to which a plaintiff was aware of and had relied on alleged misrepresentations, etc.). In addition, where (as here) "defendants have interposed a limitations defense, individualized inquiry will be needed to ascertain when each plaintiff knew or should have known of the alleged contamination." *Id.* at 673.

A brief survey of the elements of just a few of Plaintiffs' claims reveals the extent to which individualized inquiry predominates. Under Illinois law, [12] for instance, a trespass is "an invasion in the exclusive possession and physical condition of land." *Millers Mut. Ins. Ass'n of Illinois v. Graham Oil Co.*, 668 N.E.2d 223, 230 (Ill. App. 2 Dist. 1996); *see also Jones v. Wagner*, 624 A.2d 166, 169 (Pa. Super. 1993) (emphasizing the "physical entry" requirement for a claim of trespass). Thus, under the law of the state in which the alleged conduct occurred, as well as that of the forum state, each member of

---

[12] In their brief, Plaintiffs rely on Pennsylvania law when discussing the elements of their claims. At this point in the proceedings, however, no finding has been made as to whether Pennsylvania or Illinois law should apply to these Illinois Plaintiffs whose claims and injuries arose only in Illinois.

the proposed class would have to demonstrate that there had been actual "invasion" or "physical entry" of his or her own property in order to establish a claim for trespass. This is undeniably a highly individualized inquiry.

The same can be said for the claim of nuisance. A "private nuisance is a substantial invasion of another's interest in the use and enjoyment of his or her land," and the invasion must be "substantial, either intentional or negligent, and unreasonable." *Schiller v. Mitchell*, 828 N.E.2d 323, 329 (Ill. App. 2 Dist.. 2005); *see also Dumm v. Dahl*, 913 A.2d 863, 867 (Pa. Super. 2006). Whether and the degree to which each plaintiff's property was invaded, as well as the degree to which that invasion impacted the plaintiff's use and enjoyment of the land, would vary significantly from one plaintiff to the next. As a result, neither the trespass nor nuisance claims are suitable for class certification. *See also LaBauve*, 231 F.R.D. at 673 (concluding that similar trespass and nuisance claims could not be certified for class treatment).

Plaintiffs' negligence-based claims are similarly problematic. Under Illinois law, "[t]he essential elements of a cause of action based on common law negligence are the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach." *Kennedy v. Medtronic, Inc.* 851 N.E.2d 778, 783 (Ill. App. 1 Dist. 2006) (*citing Kirk v. Michael Reese Hosp. & Med. Ctr..* 513 N.E.2d 387 (Ill. 1987)); *see also Commerce Bank/Pa. v. First Union Nat'l Bank,* 911 A.2d 133, 137 (Pa. Super. 2006) (stating that, for a negligence claim under Pennsylvania law, "the plaintiff must show that the defendant had a duty to conform to a certain standard of conduct; that the defendant breached that duty; that such breach caused the injury in question; and actual loss or damage."). As one district court recognized in considering

class certification of a substantially similar contamination case, "the Plaintiffs must

prove, in addition to any negligence or other fault on the part of the Defendant, the fact of

each member's injury and the causal link between that individual's injury and

contamination." *Satsky v. Paramount Commc'ns, Inc.*, No. Civ. A. 90-S-1561, 1996 WL

1062376, at *14 (D. Colo. March 13, 1996). That court found that such inquiries could

not be conducted meaningfully on a classwide basis, as the factors that would contribute

to establishing the injury or the casual link between injury and any alleged contamination

"would be numerous, [and] would depend upon interactions among variables such as

wind and rain, would differ over time, from area to area, and from person to person." *Id.*;

*see also Arch v. Am. Tobacco Co.,* 175 F.R.D. 469, 487 (E.D. Pa. 1997) ("Plaintiffs'

negligence and strict liability theories raise[d] numerous individual issues that

predominate[d] over any class-wide issues" because "[t]he elements of [those] particular

claims ... raise[d] innumerable individual issues which overwhelm[ed] the class-wide

issues"); *Matjastic v. Quantum Pharmics, Ltd.,* Civ. A. No, 90-0647, 1991 WL 238304,

at *6 (E.D. Pa. July 22, 1991) (recognizing that state law negligence claims can "raise

substantial individual questions of ... causation"); *Martin v. Shell Oil Co.*, 198 F.R.D.

580, 592 (D. Conn. 2000) (concluding in the context of an alleged groundwater

contamination case involving negligence and negligence *per se* claims that "it [was]

likely these issues [would] require individualized proof" and that "the common issues of

law and fact [were] insufficient to overcome the extensive individualized proof of, *inter

alia*, breach [and] causation that [was] likely to be required.").

Plaintiff's fraud-based claims are equally unsuitable for litigation on a class-wide

basis. A claim for fraudulent misrepresentation must allege "that reliance by the person

to whom the statement was made led to his injury." *Cangemi v. Advocate South Suburban Hosp.*, 845 N.E.2d 792, 813 (Ill. App. 1 Dist. 2006) (*quoting Stewart v. Thrasher*, 610 N.E.2d 799, 803 (Ill. App. 4 Dist. 1993)); *see also Boyd v. Rockwood Area Sch. Dist.*, 907 A.2d 1157, 1170 (Pa. Cmwlth. 2006) (acknowledging "justifiable reliance on [a] misrepresentation" as a required element of a fraudulent misrepresentation claim). As reliance is an inherently individualized question, Plaintiff's claims will "inevitably become mired in individual-specific inquiries about which representations by defendants were heard by each plaintiff, whether and how each plaintiff relied on such representations, whether such reliance was reasonable given other information that may have been known by or reasonably available to that plaintiff, and whether and how that plaintiff was damaged by virtue of any such reasonable reliance." *LaBauve*, 231 F.R.D. at 673-74.

Based on this, it is not surprising that courts across the country have routinely denied class certification where claims similar to those asserted by Plaintiffs here have been raised and individual questions relative to the elements of those claims have been found to predominate. For instance, in *Church v. General Electric Co.*, 138 F.Supp.2d 169 (D. Mass. 2001), the court concluded that "the class vehicle [could not] be considered the superior one" where, in order "[t]o judge whether there ha[d] been a harmful enough invasion by PCBs for liability to attach under nuisance and trespass, an expert must necessarily measure the extent of the contamination of the **individual properties** and their potential exposure to future contamination." *Id.* at 181-82 (emphasis added). There, as here, the "individual characteristics of each plaintiff's property" were "crucial" to the analysis. *Id.* at 182; *see also Steering Comm.*, 461 F.3d at

602 (affirming denial of class certification where plaintiffs bringing claims for exposure to smoke from fire at defendant's facility had "suffered different alleged periods and magnitudes of exposure and suffered different alleged symptoms as a result"); *Snow*, 2006 WL 1008002, at *8-9 (denying class certification of negligence, nuisance, strict liability, and medical monitoring claims where, before "even deciding whether a person qualifie[d] as a potential claimant, it would be necessary, at a minimum, to determine: whether there was actual exposure; the length of exposure; and, the level of the exposure" to chemicals allegedly released by the defendant); *Dawson v. Dovenmuehle Mortgage, Inc.*, 214 F.R.D. 196, 201 (E.D. Pa. 2003) ("'The successful maintenance of a cause of action for fraud includes, *inter alia*, a showing that plaintiff acted in reliance on the defendants [sic] misrepresentations. Because such a showing would normally vary from person to person, the fraud cause of action is not generally appropriate for resolution in a plaintiff-class action.'" (*quoting Strain v. Nutri/System, Inc.*, No. Civ. A. 90-2772, 1990 WL 209325, at *9 (E.D. Pa. Dec. 12, 1990)); *Martin*, 198 F.R.D. at 592 (holding that individualized questions of proof regarding causation and trespass predominated in an alleged contamination case and denying class certification on that basis); *Satsky*, 1996 WL 1062376, at *14 (finding that proof of each plaintiff's actual reliance on an allegedly fraudulent misrepresentation barred certification of a misrepresentation claim in a contamination case). Application of these same principles to Plaintiffs' myriad causes of action militates against certification of the proposed classes.

> **C.** **There are significant individual differences that will need to be considered to determine exposure, a key element of each and every claim and putative class.**

As set forth above, each of the eight causes of action asserted by Plaintiffs indisputably depend on Plaintiffs being able to prove that chemicals allegedly released by

Defendants somehow made it to the Village and somehow exposed each of the class members and subject properties. (*See, e.g.,* Am. Cmplt ¶ 130 (Count I:  CERCLA Cost Recovery, 42 U.S.C. § 9607(a)); Am. Cmplt. ¶ 134 (Count II:  Nuisance); Am. Cmplt. ¶¶ 141, 142 (Count III:  Trespass); Am. Cmplt. ¶ 147 (Count IV:  Ultrahazardous Activity); Am. Cmplt. ¶ 155 (Count V:  Negligence); Am. Cmplt. ¶ 162 (Count VI: Conspiracy, Fraud, Misrepresentation); Am. Cmplt. ¶ 166 (Count VII:  Negligence Based on Statutory Violation); Am. Cmplt. 172(b) (Count VIII:  Willful and Wanton Misconduct).) Plaintiffs in fact concede in their Memorandum that exposure must be found by this Court to be a common issue in order for their case to go forward as a class action. (*See, e.g.,* Pl. Br. at 31 (medical monitoring claim – common question of whether class members were "exposed to TCE, 1,1-DCE and/or VC in amounts higher than normal background levels"); 39 (nuisance claim – "did defendants handle TCE, 1,1-CDE and VC in a manner that contaminated private wells throughout McCullom Lake Village"); 40 (trespass claim – "did defendants cause TCE, 1,1-DCE and VC to enter private wells in McCullom Lake Village"); 41 (strict liability – "whether that activity caused harm to property – i.e. exposure – also is a question common to all Class members."); 42 (negligence – did class members "suffer property damage" as a result of exposure to chemicals.))

But, contrary to what Plaintiffs claim, exposure cannot be determined on a uniform or common basis. Like in *Thomas*, individual issues concerning complex issues of hydrogeology will need to be examined to determine whether any particular person or property was exposed.

1.      *Plaintiffs' hydrogeologic expert concedes that his model will not demonstrate uniformity of exposure, and that individual examinations of exposure will need to be conducted.*

Unlike a significant single atmospheric release of a volatile chemical, where a whole neighborhood may be simultaneously enveloped by a cloud of noxious gas with immediate toxic effect, the alleged exposure pathway in this case (*i.e.*, the way the chemicals made their way from the sites in question to McCullom Lake Village, if at all) is speculative from the outset. This is because Plaintiffs have proffered no analytical data whatsoever to establish the presence of vinyl chloride ("VC") in any source of water accessed by residents or visitors to the Village, or the presence of other alleged compounds, released by different Defendants which, under specific circumstances, purportedly "break down" or degrade in to VC, namely the COCs. Plaintiffs' primary environmental expert,[13] J. Gregory Hill, conceded that he was not aware of any well data at any time establishing the presence of VC or other COCs in wells in the Village. (Hernandez-Malaby Aff., Ex. B at 60-61; 65- 66; 68-69; 138; 140; 147-148.)

Since the Hill deposition, Plaintiffs have produced test results from another twenty-four wells in the Village, **none** of which have established the presence of VC or other COCs. (Hernandez-Malaby Aff., Ex. G and I.) The only chemicals detected are

---

[13] Paolo Zannetti, Plaintiffs' environmental meteorologist who is cited by Plaintiffs as "proving" common issues of exposure, so qualified his statement (which he does not even call a report) that, in fact, he opined as to nothing. The only thing that he "concludes" in his statement is that he can conduct an analysis of potential airborne exposure, but makes no promises or even projections regarding whether uniformity of exposure can be found: "From the material examined so far and my previous experience in air pollution studies, it is very clear to me that this case **can be further examined** using scientific methods and computer models in order to assess the air pollution impact at the plaintiffs' locations caused by the emissions of the defendant." (Pl. Br., Ex. B at ¶ 6 (emphasis added).) Based on this, Plaintiffs' assertion that Zannetti's statement "identified potential pathways in the …airflow through which hazardous chemicals located on defendants' properties contaminated plaintiffs'….air supplies" (Pl. Br. at 31) is disingenuous.

chloride and ammonia, which could result from, for example, road and sidewalk salt. (Hernandez-Malaby Aff., Ex. I at 2.)[14]

Notwithstanding the absence of analytical data from domestic wells showing contamination, Hill's basic conclusion is that "there exist several groundwater pathways ... by which significant quantities of hazardous chemicals likely were transported to domestic wells in McCullom Lake Village." (Pl. Br., Ex. A at 2 ("Hill Report"); *see also* Hernandez-Malaby Aff., Ex. B at 62-65.) But Hill concedes that even under his hypothetical model, contaminant concentrations in some wells could be above safe levels and in other wells below such levels. (Hernandez-Malaby Aff., Ex. B at 109.) Indeed, when asked if concentrations would be identical at each domestic well, Hill said "**that's unlikely to be the case**, but it will await the modeling." (*Id.* at 108-109 (emphasis added); *see also id.* at 145, 146.)

Moreover, Hill's hypothetical model will purportedly predict a plume of contamination in three dimensions. Hill concedes that the "shape" of the plume (*i.e.* its location), and the contaminant concentrations, will all change over time. (*Id.* at 243.) An individual assessment will therefore need to be made for every private well in the Village to determine whether the well ever drew water from this theorized plume of contamination and, correspondingly, whether the residents were exposed as a result:

> Q.     So to determine the exposure for any particular household, you'll have to see where the straw associated with that well sticks down into your model output won't you?
>
> A.     Yes.

---

[14] The McCullom Lake Village area is also highly agricultural, and has feed lots that also could trigger ammonia releases.

(*Id.* at 243-244.)  **The need for a household-by-household assessment of exposure against some future model to be run by a yet-to-be-retained modeling expert is a fatal flaw in the motion for class certification.**  *Thomas,* 846 F.Supp. at 1404 ("In the present case, while there are undoubtedly common issues of law and fact, such as whether [defendant] released TCE into the groundwater, the individual issues of causation and damage so overshadow those in numerosity and complexity to render a class action unhelpful.").

Hill further concedes that he has not checked the specific depth of each domestic well in the Village. (Hernandez-Malaby Aff., Ex. B at 77-78.)  Nor has he determined when specific wells were installed. (*Id.* at 78.)  Nor does he know when or how long the Gates, or any other resident for that matter, have lived in the Village. (*Id.* at 141.)  But these are key variables in any analysis of exposure because they differ to one significant extent or another from resident to resident.

As shown in Exhibit 1 to this Brief, domestic wells in McCullom Lake Village range from approximately 10 to 300 feet in depth. (*See also* Hernandez-Malaby Aff., Ex. J at 5; Hernandez-Malaby Aff., Ex. B at 130-131.)  As a result, these wells draw water from different elevations and different aquifers (*i.e.,* sources of water) (Hernandez-Malaby Aff., Ex. J at 5; Figure 2), each of which may have different concentrations of COCs at different times (Hernandez-Malaby Aff., Ex. K at 7).  Hill apparently hopes to "group" domestic wells by location for comparison to the modeled plume of contamination. (Hernandez-Malaby Aff., Ex. B at 244.)  But he admits that he can do so only if the wells are similarly situated (*i.e.,* installed at the same time and screened at the same depth). (*Id.*)  As shown in Exhibit 1, that is not the case.

The fact that the wells draw from different aquifers debunks the notion that each Villager would be subject to the same exposure because of a unified water source. In his original report, Hill hypothesized that Aquifers 1 and 5 were "hydraulically interconnected" suggesting that "deeper contaminants could migrate upward at this location towards McCullom Lake." (Hill Report at 4.) This was an apparent attempt to suggest that contamination reaching McCullom Lake Village in the deep bedrock aquifer (Aquifer 5) might be drawn to shallower domestic wells located in Aquifer 1. During his deposition, however, Hill conceded that there could be no movement of water between aquifers absent some other force to move the water. (Hernandez-Malaby Aff., Ex. B at 186-187.)

> Q.     Well, does that mean contamination that may exist
> at depths at 200 feet on its own isn't going to move up to
> the 50-foot level?
>
> A.     If the heads are the same in the shallow aquifer,
> that's correct.

(*Id.* at 187-188.) Hill eventually conceded that he had not seen any data to demonstrate that water in Aquifer 5 was, in fact, recharging the much shallower McCullom Lake. (*Id.* at 197-198.) The Rawlinson report makes clear that, except perhaps in the far eastern side of the village, the vertical gradients suggests that water flows **down** towards Aquifer 5, not up from Aquifer 5. (Hernandez-Malaby Aff., Ex. J at 6.) As a result, contamination from Aquifer 5 could not move upwards to "contaminate" any shallower aquifer.

2.      *Divergent subsurface conditions at the Village will require individualized examinations of conditions, which will prevent uniform treatment of a medical monitoring class.*

Hill will be the first to point out that references he relied upon in his preliminary report reflect "regional work" that "doesn't focus on the smaller scale with any kind of accuracy or precision." (Hernandez-Malaby Aff., Ex. B at 178-179.) Although apparently reliable enough to cite in support of his theory of contamination, this uncertainty also destroys any notion of commonality with respect to exposure. With the likelihood of significantly variable geologic conditions underneath the Village, combined with (1) a plume of contamination that may be deep or may be shallow but in any event changes over time and (2) domestic wells at different depths that may or not be exposed to contamination, there is simply no way to avoid anything but a well-by-well examination to determine the alleged contamination.

The work of Modine's experts, based on publicly-available information, shows great variability in the depth, date of construction, and geological setting of domestic wells in McCullom Lake Village. (*See, e.g.,* Hernandez-Malaby Aff., Ex. J at Figure 2.) The need, ultimately, for an individualized assessment of each well in the Village because of these subsurface differences can be demonstrated in a wide variety of ways. The following are two examples.

First, consider homes within the two blocks represented by 4900 and 5000 Maple Hill Drive. One well, installed in 1978 to a depth of 147 feet, is screened in the bedrock aquifer (Aquifer 5). (*Id.* at 47 and Figure 2.) Two others, installed in 2006 to depths of approximately 70-77 feet, are screened in Aquifer 4. (*Id.* at 48-49 and Figure 2.) Yet another, installed in 1997 to a depth of 32 feet, is screened in Aquifer 1. (*Id.* at 50 and Figure 2.) This readily demonstrates that the depths of wells vary house by house, and

any assessment of "exposure" will require a house-by-house examination of corresponding wells.

Second, consider domestic wells installed at the same depth but in different parts of the Village.  Wells at 5303 Fountain Lane on the west side of the Village (*id.* at 39 and Figure 2), and 4706 Parkview on the east side (*id.* at 55 and Figure 2), are installed to depths roughly equal to 130 feet.  The well on Parkview is screened in the bedrock (Aquifer 5) at an elevation above mean sea level (MSL) of approximately 640 feet.  The well west on Fountain Lane, however, which is just as "deep," is located in an area where surface elevations are much higher.  As a result, the western-most well only reaches Aquifer 4, is screened at about 713 MSL (some 70+ feet higher than the eastern well), and is separated from Aquifer 5 by a layer of clay.  This demonstrates how wells of equal depth may have uniquely different characteristics depending upon their location in the Village.

Another significant variable that would require household-by-household assessments is the role of private septic systems in subsurface contamination.  Until just recently, a majority of Village residents relied on individual septic systems.  (Roddewig Report at 7; Hernandez-Malaby Aff., Ex. L at 35.)  Municipal sewer hookups apparently first became available only in 2003.  (Hernandez-Malaby Aff., Ex. M at 20-22.)  Some residents such as Jeanne Hansen still rely on their own septic system.  (*Id.*)  These septic systems sometimes failed.  Sewage leaked into the soil.  (*Id.* at 21 ("It was like a little cesspool thing with the sewer cover on.  And when I'd wash clothes, it would start to bubble up.")).  Many materials discarded by homeowners, like household cleaners, paints, or grease/oil products – all of which could have ended up in the septic tanks –

contain hazardous components that could have contaminated property, and surrounding ground water, through failing septic systems.[15]  Even a perfectly operating septic system is designed to leach effluent into the soils – the same soils that might overlay drinking water wells.  The only way to find out whether any possible contamination is present in any well is the result of a septic system (as opposed to any conduct of Defendants), will be a mini trial for each household.[16]

Given all this, for any given putative class member, the court will have to consider, at a minimum, the following to determine whether the person could even be a member of any class:

- Whether the modeled plume of contamination reached the location of that class member.

- Whether that class member ever drank water from a well tapping into the plume of contamination.

- For such a well, (i) when it was installed, (ii) how deep it was, (iii) whether it was insulated from contamination by impermeable layers of clay, (iv) how long it tapped into contaminated groundwater, (v) whether the concentration of contaminants varied over time at that location, and (vi) whether it was ever impacted by contamination at the home itself (*e.g.* septic systems).

- For such a class member, how long they consumed water from any such well in addition to other parameters and risk factors (e.g., type of employment, family history of cancer, etc.).

The wide range of variables in play demonstrate how the exposure of each class member will have to be examined on a case-by-case basis, thus precluding certification.

---

[15] These include numerous volative organic compounds like those at issue in this case.

[16] Some of the boring logs describe just how close domestic wells can be to septic systems.  The well at 5111 Fountain Lane is just 50 feet from a septic tank and 60 feet from a seepage tile field. (Hernandez-Malaby Aff., Ex. J at 45.)  The well at 2802 Orchard is only 50 feet from a septic tank and 75 feet from a seepage tile field.  (*Id.* at 53.)

**D.    There are significant differences between and among class members with respect to the impact of exposure as well.**

There are also significant differences between and among putative class members as to the alleged "risk" of developing cancer, assuming that exposure even occurred.  The consideration of these differences would also overwhelm any trial of this matter.

The risk resulting from alleged exposure is key to the medical monitoring claim, in that Plaintiffs in order to succeed must show that the class members "have a significantly increased risk of contracting a serious latent disease as a result of the exposure" (Pl. Br. at 34).  Plaintiffs concede in their supporting Memorandum that "[i]ndividual past exposures are relevant to medical monitoring".  (Pl. Br. 46; *see also* Pl. Br. at 30.)  They allege, however, that such individual issues are immaterial because the Court "is able to determine through common evidence a baseline exposure across the entire Class population that triggers the need for medical monitoring independent of any other medical circumstances." (Pl. Br. 46.)  Plaintiffs make this broad claim without attribution, and with good reason – **none** of Plaintiffs' experts have said this, and in fact some conceded just the opposite during class certification discovery.  To the extent that Plaintiffs' experts say anything regarding exposure and potential risk, they have so limited and qualified their reports that they cannot be relied upon as proof of commonality as to the medical monitoring elements of exposure, increased risk of cancer, or that medical monitoring is reasonably necessary.

For example, Dr. Ginsberg, Plaintiffs' toxicology expert, opined that "each of the three chemical compounds is a proven hazardous substance and/or degrades into a proven hazardous substance." (Pl. Br. at 32.)  But while VC is a hazardous substance, it has only been linked to liver cancer, **not** brain cancer. (Hernandez-Malaby Aff., Ex. A at 17;

Bigner Report at 6.[17])  There are no known instances of liver cancer in this community.

Moreover, Ginsberg conceded at his deposition that the "risk" of developing any disease

as a result of an individual's exposure to any chemical compound will depend in part

upon how long that individual was exposed to the chemicals in question.  Ginsberg

admitted, for example, that a six month period of exposure to vinyl chloride before the

onset of brain cancer would be "too short," as would a two year period of exposure.

(Hernandez-Malaby Aff., Ex. C at 117-118; 119-123.)  When considering the vast

differences between and among putative class members as to even the amount of time

they have been exposed,[18] a person by person analysis would have to be conducted to

determine what class member would have to be excluded because of differences in

exposure.

      Ginsberg further admitted that a determination of whether a risk exists from any

alleged exposure would depend upon whether the particular individual had been exposed

to any other substance that would predispose that person to cancer: "you certainly would

want to look back through their entire medical history and the past exposures to see if

there was some other predisposing factor."  (Hernandez-Malaby Aff., Ex. C at 30-31.)  In

fact, Ginsberg concedes that there are many factors that contribute to the determination of

whether a person is more likely to develop a particular cancer: "Lets put it this way: That

---

[17] Dr. Bigner's Report (submitted as part of Rohm and Haas' Opposition) states that none of the chemicals at issue in this matter "can cause or contribute to the growth of the alleged PSC neoplasms."  (Bigner Report at 6.)

[18] These differences are not hypothetical, in that the class depositions that were conducted showed marked difference in "exposure" to well water in the Village.  For example, putative class representative Glenn Gates has lived in the Village for most of his life and until recently drank the well water. (Hernandez-Malaby Aff., Ex. L at 30).  Alleged class member Edwin A. Begley, Jr., on the other hand, has only lived in the Village in 2002, and has never used well water for drinking purposes. (Hernandez-Malaby Aff., Ex. N at 23.)  See *also infra* at 50.

cancer is multifactoral and that along with vinyl chloride exposure there may be other factors that could contribute to the overall risk in an individual." (*Id.* at 137-139.)

Dr. Whysner, Modine's toxicology expert, confirms that a number of individual issues would need to be assessed to determine whether a person is at an increased risk of cancer because of VC exposure or otherwise, including but not limited to the following:

- There are genetic differences between and among individuals with respect to how the body transforms chemicals to metabolites that may be more or less toxic. (Hernandez-Malaby Aff., Ex. A at 26.)  In fact, VC is a "DNA-reactive carcinogen that requires bioactivation" in a certain way in order to impact cancer development. (*Id.*)  Such differences impact whether a person can or will develop liver cancer, even if exposure were uniform. (*See also* Bigner Report at 64.)

- Dr. Bigner, an expert in Neuropathology and Neuro-Oncology, further states that heredity and genetics play a "major role" in the development of CNS neoplasia, and provides a list of hereditary syndromes associated with brain tumors  (Bigner Report at 42-44.)  Each class member would need to be examined to determine whether he or she has any of these conditions.

- Whether or not a person consumes alcohol can determine how easily VC can be metabolized, as does use of certain pharmaceuticals, and whether or not the individual has diabetes,[19] or is obese.  (Hernandez-Malaby Aff., Ex. A at 26-27.)

- Other risk factors for brain cancer that have been studied include "infections, head trauma, foods, drugs, lack of vitamins, chemicals, occupations, electromagnetic fields, social class, seizure disorders, diabetes, race, geography, and birth order"; however, "in none of these cases has a causal association been established." (*Id.* at 22.[20])

Thus, as with the consideration of the possibility of exposure, the question of whether the community is at an increased risk of cancer, and therefore should be monitored, would

---

[19] Donna Gates, one of the two named plaintiffs, has diabetes.  (Hernandez-Malaby Aff., Ex. O at 32.)

[20] An article embraced by Plaintiffs' "expert", Dr. Neugebauer, states that there are a number of other causes of brain cancer.  (Hernandez-Malaby Aff., Ex. R.)  Plaintiffs cannot on the one hand say that there can be a determination of uniformity of risk of brain cancer and at the same time advance the notion that there are many causes of such cancer.

necessarily involve individualized examinations of individual biological issues, occupational history, and other factors.

Also illustrative of the need to examine individual differences is the fact that the "brain cancer" that allegedly needs to be "detected" by medical monitoring is not a "singular cancer," specific neoplasm, or disease. Indeed, the twelve state court plaintiffs cited by Plaintiffs in their Motion as proof of the risk of "brain cancer" do not, in fact, have a single form of cancer – they have different kinds of cancer, many of which are not even categorized as brain or nervous system tumors.[21] (Hernandez-Malaby Aff., Ex. A, 17-19.) As Dr. Bigner correctly states:

> The World Health Organization classification of brain tumors lists 126 different types (Kleihues and Cavenee, 2000) (Table 3). Each major type has its own distinct molecular alterations that cause the uncontrolled growth of brain tumor cells. It is scientifically unacceptable to "lump" all brain tumor types together when discussing causation. The alleged *PSC neoplasm* have distinct molecular signatures and molecular etiology consistent with development from endogenous processes in the body.

(Bigner Report at 9.)[22]

The only other "proof" advanced by Plaintiffs as to commonality of risk is the report of Richard Neugebauer, a historian who now has a masters degree in public health with an emphasis in epidemiology. (Pl. Br., Ex. D (*curriculum vitae*)). Dr. Neugebauer, acknowledges that he only is in the early stages of investigating a " possible cancer cluster in the area of the Village." (Pl. Br., Ex. D at 1.) Yet he claims that the information provided to him by the Plaintiffs' attorneys "…is sufficient to raise substantial public health concerns and to warrant a full epidemiologic investigation of a

---

[21] For example, pituitary tumors "are not brain tumors." (Bigner Report at 28-29.)

[22] Indeed, glioblastoma multiforme "is a brain neoplasm of heterogeneous cellular morphology and tissue architecture; hence, the name 'multiform'." (Bigner Report at 21.)

possible cancer cluster in the area." (*Id* at 1.) His "preliminary assessment" is that the

Village "lies close to a major source of environmental contamination," that the rates of

two brain cancer subtypes (glioblastoma and oligodendroglioma) "appear considerably

elevated in this small geographic area," and that a groundwater plume included vinyl

chloride, a "well-established" carcinogen for which there is "evidence of a link with brain

cancer." (*Id.* at 1-2.)[23] But, as set forth above, Dr. Neugebauer concedes that he will

need to conduct individual examinations to determine whether there is, in fact, any

increased risk from exposure. *Supra* at 4.

But Dr. Patricia Buffler, Professor of Epidemiology and Dean Emeritus, School of

Public Health, University of California, Berkeley, concluded that Neugebauer's

assessment does not provide ***any*** support for Plaintiffs' assertion that environmental

contamination has caused an excess risk of oligodendroglioma or any form of brain

cancer. Buffler points to three major flaws in the assessment:

- Although Neugebauer states that his target (exposed) population is "within a three mile radius south of Ringwood," he includes in the analysis people living west, not south, of the alleged industrial sources of contamination. (Hernandez-Malaby Aff., Ex. Q at 6.)

- Neugebauer claims that "the rates of two brain cancer subtypes, glioblastoma . . .and oligodendroglioma . . ., appear considerably elevated in this small geographic area." However, **his report presents no data to substantiate the claim with regard to glioblastoma.** And his analysis of observed and expected numbers of oligodendrogliomas is invalid as he includes an observed case (one of only three total observed cases) of a person who worked, but did not live, in the area, without also counting within the target population for computing the expected incidence those people who worked, but did not live, in the

---

[23] His report identifies five people diagnosed with oligodendroglioma during the time period 2002 through 2005, who, at diagnosis, lived in "the geographic area of concern," had previously lived in this area or had worked in the area. Among these five cases, "3 lived or worked within the 3 mile radius south of Ringwood ." (Pl. Br, Ex. D at 3.) He concludes that the rate of oligodendroglioma in the exposed population is eight times that of the rate in the general population, a result that he says is statistically significant. (*Id.* at 3.)

area. **If this single (and improperly counted) observed case is excluded from the analysis , the difference between the observed and the expected number of oligodendrogliomas is no longer statistically significant.** (*Id.* at 7.)[24]

- Neugebauer's review of the scientific literature pertaining to vinyl chloride, the agent for which he claims there is "evidence of a link with brain cancer" is incomplete and ignores important recent studies of vinyl chloride and brain cancer. **Based on the complete body of current literature, there is no consensus among scientists, nor is it generally accepted, that vinyl chloride is an established cause of any form of brain cancer in humans.** (*Id.* at 8-12.)[25]

E.    **Individualized issues regarding limitations defenses would also render a class action unmanageable.**

Limitations defenses on one or more of the claims outlined in Plaintiffs' Amended Complaint, as well as the necessary analysis of those defenses as to each of the proposed class members, further highlight the predominance of individualized issues in this litigation and the insurmountable complications these inquiries would inject into the proposed class action. *See, e.g., LaBauve*, 231 F.R.D. at 674 ("The primacy of individual-specific proof considerations is further magnified under the lens of defendants' statute of limitations defense."); *id.* at 675 (noting that "[o]nly after painstaking factfinding on a plaintiff-by-plaintiff basis [would] each plaintiff's status vis a vis [*sic*] the statute of limitations defense be ascertainable"). Where the timeliness of each claim brought by each of the proposed class members – and with respect to each of the Defendants – must be evaluated separately, a class action would simply be unmanageable. *See, e.g., Corley v. Entergy Corp.*, 220 F.R.D. 478, 487-88 (E.D. Tex.

---

[24] In addition, Dr. Buffler notes that Neugebauer's investigation of observed and expected numbers of oligodendrogliomas did not adjust for age, gender or any other demographic factors typically considered in such ecologic analyses. (*Id.*)

[25] The utter lack of scientific or clinical evidence or consensus supporting a causal link between exposure to vinyl chloride and brain cancer is well supported in the record. (See Bigner at 6-8, 62-68; Hernandez-Malaby Aff., Ex. A at 6-16.)

2004) (limitations issues defeated predominance where timeliness of each plaintiff's claims could not be effectively addressed in the context of a class action); *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 414 (C.D. Cal. 2000) ("Based on the individualized, fact-intensive nature of the necessary inquiry in this case, the statute of limitations issues preclude a finding that common issues predominate over individual issues.").

As statutes of limitations have been deemed a procedural matter in the choice-of-law analysis, Pennsylvania, as the forum state, may require that its statutes of limitations apply to the claims brought by Plaintiffs and the members of the proposed, primarily Illinois-residing class. *Sun Oil Co. v. Wortman*, 486 U.S. 717, 722-23 (1998) (statutes of limitations are procedural for purposes of the Full Faith and Credit Clause and therefore the forum state has discretion to apply its own statutes of limitations to causes of action that accrued in another state).   To that end, Pennsylvania's Uniform Statute of Limitations on Foreign Claims Act (commonly known as the "borrowing statute") directs that the "period of limitation applicable to a claim accruing outside th[e] Commonwealth shall be either that provided or prescribed by the law of the place where the claim accrued or by the law of this Commonwealth, whichever first bars the claim." 42 PA. STAT. ANN. § 5521(b).   As Pennsylvania applies a two-year statute of limitations to all of the claims at issue in this matter – as short or shorter than those provided under Illinois law – that two-year limitations period will apply in this case.[26]   In addition, Pennsylvania has

---

[26] Under PA. STAT. ANN. § 5524, "[t]he following actions and proceedings must be commenced within two years: (2) An action to recover damages for injuries to the person . . . (4) An action for waste or trespass of real property . . . [and] (7) Any other action or proceeding to recover damages for injury to person *or* property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud . . . ." (emphasis added).   *See also Powell v. First Republic Bank*, 274 F.Supp.2d 660, 677 (E.D. Pa. 2003) (finding that the statute of limitations for fraud in Pennsylvania is two years); *Cutting Edge Sports, Inc. v. Bene-Marc, Inc.*, No. 01823, 2006 WL 1492452, at *2 (Pa. Com. Pl. May 2,

adopted the discovery rule, which means that the applicable statutes of limitations are tolled until a plaintiff learns or should have learned through exercise of reasonable diligence that he or she has been injured. *Drelles v. Manufacturers Life Ins. Co.*, 881 A.2d 822, 831 (Pa. Super. 2005).

Conducting the statute of limitations analysis in this case will be a monumental task. Based on the pleadings in this case, there are somewhere between 400-500 homes and at least 1,000-1,500 residents within the proposed geographical boundaries and the proposed definition of the classes. (Pl. Br. at 28; Am. Cmplt. ¶ 113.) As an initial matter, determining when any person discovered or, through reasonable diligence, could have discovered the injuries alleged in each of Plaintiffs' claims would require the same "painstaking factfinding" that led the court in *LaBauve* to deny class certification. 231 F.R.D. at 675. Throughout their papers, Plaintiffs have alleged and described various events and conduct by different defendants over several decades that arguably could have provided such notice to some number of the proposed class members. (*E.g.*, Pl. Br. at 6, 7, 13.) In light of the extensive history described, some number of the alleged members of the proposed classes may have learned of the alleged "injuries" before Plaintiffs filed this action, and discovered or reasonably could have discovered this information during

---

2006) (applying a two-year statute of limitations in non-personal injury negligence case); *Mest v. Cabot Corp.*, 449 F.3d 502, 510 (3d Cir. 2006) (applying a two-year Pennsylvania statute of limitations to claims for trespass, nuisance, "outrageous conduct" and negligence *per se*). For conspiracy, the statute of limitations is the same as that for the underlying action forming the basis of the conspiracy (in this case, fraud or fraudulent misrepresentation, which is also two years.). *See Kingston Coal Co. v. Felton Mining Co., Inc.*, 690 A.2d 284, 287, n.1 (Pa. Super. 1997). Illinois, on the other hand, applies a two-year or five-year statute of limitations, depending on whether the cause of action is based on personal injury or injury to property (*see* 735 ILCS 5/13-202, -205). Modine also notes that CERCLA's Section 9658 statute of limitations provision does not alter this analysis: "Because of Pennsylvania's discovery rule, the limitations period for . . . common law tort claims is identical, regardless of whether Pennsylvania or CERCLA limitations law is applied. *Tri-County Bus. Campus Joint Venture v. Clow Corp.*, 792 F. Supp. 984, 995 n.11 (E.D. Pa. 1992).

the many years and by way of the many alleged events that Plaintiffs have chronicled in their pleadings.

For example, Plaintiffs acknowledge that copies of IEPA filings were deposited in the Johnsburg, Illinois Public Library (Am. Cmplt. ¶ 45), which is less than four miles away from the name Plaintiffs' home, and it would be even closer to the homes of other residents of the Village. Whether and when members of the proposed class might have seen those documents – in the course of investigating the purchase of a home in the Village or under other circumstances – is something that would have to be considered as part of the statute of limitations analysis. This is just the tip of the iceberg. Public access to other IEPA or EPA reports, press accounts of alleged spills and contamination, personal encounters with defendants' representatives, individual homeowners' routine testing of their wells, and many other possible avenues of information existed during the course of the period of alleged contamination, all of which would be relevant in determining whether the applicable two-year statute of limitations had run with respect to each alleged member of the proposed classes.

**F.     Summary.**

The differences discussed above are not all of those that would need to be considered by this Court at any trial of this matter. Other differences that will need to be considered include, for example, those in the quality and nature of each of the properties in the Village in order to determine whether the value of such property has increased or decreased based on factors other than the alleged contamination. All of these differences act in such a way so as to require this Court to engage in "mini trials," which destroys the efficacy any class certification may bring. Rule 23(b)(3)(D) (matters to be considered in determining predominance include "the difficulties likely to be encountered in the

management of a class action."). It thus cannot be said that common issues predominate as required by Rule 23(b)(3).

**V.    THE DIFFERENCES BETWEEN AND AMONG CLASS MEMBERS AS TO EXPOSURE AND DAMAGE, COMBINED WITH THE FACT THAT PLAINTIFFS ARE NOT PREDOMINATELY SEEKING INJUNCTIVE RELIEF, ALSO PRECLUDE CERTIFICATION UNDER RULE 23(B)(2).**

Plaintiffs also are not entitled to certification under Rule 23(b)(2), which allows a Court to certify a class only if a plaintiff can satisfy all of the requirements of Rule 23 and can also demonstrate that he or she is seeking "final injunctive relief or corresponding declaratory relief with respect to the class as a whole." First, damages are the primary form of relief sought in this case. While Plaintiffs claim that they are seeking primarily injunctive relief, what they really want this Court to do is award the class money so that class members can obtain the services they desire. Since the relief sought is primarily monetary, Plaintiffs' classes cannot be certified under this provision of Rule 23(b). Further, as Plaintiffs concede, certification is only proper under Rule 23(b)(2) if a plaintiff can demonstrate that there is a "cohesive" class. The many differences between and among the putative class members precludes such a finding here because such differences impact determinations of liability and damages.

**A.    Plaintiffs' "injunctive" claims are, in fact, monetary claims; as a result, Rule 23(b)(2) cannot apply.**

As the Third Circuit explained in *Barnes v. American Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998) – a case where, like here, plaintiffs sought to certify a so-called "medical monitoring" class – Rule 23(b)(2) was designed for civil rights actions where plaintiffs sought injunctive relief for a large group of people. *Id.* at 142. The class sought to be certified must therefore be predominately seeking injunctive relief. If the district court

determines that the injunctive relief sought is, in fact, a "disguised" request for

compensatory damages, certification under Rule 23(b)(2) is improper.

> The dispositive factor that must be assessed to determine whether a
> medical monitoring claim can be certified as a Rule 23(b)(2) class is –
> what type of relief do plaintiffs actually seek.  If plaintiffs seek relief
> that is a disguised request for compensatory damages, then the medical
> monitoring claim can only be characterized as a claim for monetary
> damages.  In contrast, if plaintiffs seek the establishment of a court-
> supervised medical monitoring program through which the class
> members will receive periodic medical examinations, then plaintiffs'
> medical monitoring claims can be properly characterized as claim
> seeking injunctive relief.

*Id.* at 131.  Even if a claim has equitable aspects, if the relief sought is predominately

money damages, certification under Rule 23(b)(2) is improper.  *Thomas*, 846 F.Supp. at

1403, 1404 (plaintiffs claims for medical monitoring, CERCLA violations and RCRA

violations predominately claims for monetary damages).

Here, Plaintiffs generally assert that certification under Rule 23(b)(2) is proper for

all of its proposed classes because remedies sought "include" a request for injunctive

relief "in the form of additional monitoring and remedial measures…."  (Pl. Br. at 45,

46).  The fact that Plaintiffs lump all of their putative classes together in making this

argument is telling, because by definition two of the putative classes – the property loss

and punitive damage class – seek only monetary damages, which exclude them from

consideration under Rule 23(b)(2).  As to the other two putative classes – the medical

monitoring and injunctive relief classes – Plaintiffs do not, in fact, seek injunctive relief

as to these classes either.  This is demonstrated in the "Relief Requested" section of the

Amended Complaint, in which Plaintiffs ask this Court to force Defendants to pay money

to the Court that will then be paid to the Plaintiffs for whatever they spend in obtaining

some undefined "medical monitoring" and in connecting to city water and other alleged

abatement measures. (Relief Requested B, C, and F). This thinly disguised request for

monetary damages does not pass muster under Rule 23(b)(2):

> Relief in the form of medical monitoring may be by a number of
> means. First, a court may simply order a defendant to pay a plaintiff a
> certain sum of money. The plaintiff may or may not choose to use that
> money to have his medical condition monitored. Second, a court may
> order the defendants to pay the plaintiffs' medical expenses directly so
> that a plaintiff may be monitored by the physician of his choice.
> **Neither of these forms of relief  constitute injunctive relief as
> required by Rule 23(b)(2).**

*Barnes*, 161 F.3d at 132 (emphasis added) (*quoting Day v. NLO, Inc.*, 144 F.R.D. 330,

335 (S.D. Ohio), *rev'd on other grounds*, 5 F.3d 154 (6th Cir. 1993)); *see also Thomas*,

846 F.Supp. at 1404 (costs of medical monitoring "nothing more than compensation for

necessary medical expenses reasonably anticipated to be incurred in the future. Absent

anything more than an exchange of money, as requested by plaintiffs, these damages

cannot be injunctive in nature." (citation omitted)).

### B.    There is no cohesive class because of differences in exposure and potential medical consequences.

Certification is also improper under Rule 23(b)(2) because the classes proposed

are not "cohesive." In *Barnes*, the court discussed at length the well-established

requirement of cohesiveness and the reasons behind it – namely, to protect class members

and to ensure manageability:

> In *Santiago* [*v. City of Philadelphia*, 72 FRAUD 619, 628 (E.D. Pa.
> 1976)], the court recognized two reasons why courts must determine
> whether a proposed (b)(2) class implicates individual issues. First,
> unnamed members with valid individual claims are bound by the
> action without the opportunity to withdraw and may be prejudiced by a
> negative judgment in the class action. "Thus, the court must ensure
> that significant individual issues do not pervade the entire action
> because it would be unjust to bind absent class members to a negative
> decision where the class representatives' claims present different
> individual issues than the claims of the absent members present."
> Second, "the suit could become unmanageable and little value would

> be gained in proceeding as a class action . . . if significant individual
> issues were to arise consistently." Santiago, 72 FRAUD at 628.

*Barnes*, 161 F.3d at 143.  The Third Circuit in *Barnes* further analogized the

cohesiveness requirement of Rule 23(b)(2) to the predominance requirement of Rule

23(b)(3), holding that the Rule 23(b)(2) requirement is, in fact, stricter than Rule 23(b)(3)

because the class members are unable to opt out:

> While *Amchem* involved a Rule 23(b)(3) class action, the cohesiveness
> requirement enunciated by both this court and the Supreme Court
> extends beyond Rule 23(b)(3) class actions.  Indeed, a (b)(2) class may
> require more cohesiveness than a (b)(3) class.  This is so because in a
> (b)(2) action, unnamed members are bound by the action without the
> opportunity to opt out.

*Id.* at 142-43.

Based on this standard, the Third Circuit concluded that the District Court was

correct when it found that the putative class of persons suffering from the effects of

tobacco use was not sufficiently "cohesive" because "addiction, causation, the defenses

of comparative and contributory negligence, the need for medical monitoring and the

statute of limitations present too many individual issues to permit certification. As in

*Amchem*, plaintiffs were 'exposed to different . . . products, for different amounts of time,

in different ways, and over different periods.'  *See Amchem*, 117 S.Ct. at 2250 (citation

omitted). These disparate issues make class treatment inappropriate." *Barnes*, 161 F.3d

at 143.

In this case, as set forth above, none of the classes are cohesive because there are

so many material differences between and among the class members on key issues such

as exposure and risk factors.  These differences are illustrated in the following chart

which summarizes some of the information gleaned from the five alleged class member

depositions that were conducted in this matter:

| Name | Age | Dates lived in Village | Time lived elsewhere | Consumption of well water | Well test | Susceptibility factors |
|------|-----|------------------------|----------------------|---------------------------|-----------|------------------------|
| Donna Gates | 60 | 1966 – present | 20 years (Kentucky growing up) | Consumed prior to initiation of action (approx. 50 years) | Yes; negative for COCs | Diabetes; cancer in family |
| Glenn Gates | 64 | 1945 – present | 2 years (Kentucky while in army) | Consumed prior to initiation of action (approx. 59 years) | Yes; negative for COCs | Cancer in family |
| Jeanne Hansen | 72 | 1988 – present | Approx. 53 years (Chicago) | Consumed entire time lived in Village (approx. 19 years) | None known | Cancer in family |
| Edwin Begley Jr. | 27 | 2002 – present | 22 years (other Illinois cities) | Does not consume well water | None known | None known |
| Joseph Zakrocky | 38 | 1996 – present | 28 years (suburb of Chicago) | Consumed entire time lived in Village (approx. 11 years) | Yes; negative for COCs | Cancer in family |

These differences, and the myriad of others that will necessarily emerge given the breadth of the four proposed classes, requires the denial of Plaintiffs' Motion.

## VI.   THE PRESENCE OF MULTIPLE DEFENDANTS THAT ALLEGEDLY RELEASED DIFFERENT CHEMICALS OVER DIFFERENT TIME PERIODS FURTHER UNDERMINES PLAINTIFFS' BID FOR CLASS CERTIFICATION.

Plaintiffs have joined together in one suit different defendants who allegedly released different chemicals at and over different time periods. The presence of multiple defendants, with presumably different liability levels and different defenses provides

additional bases for the denial of Plaintiffs' class certification motion. Specifically, the named Plaintiffs will be unable to establish that they have a typical claim under these circumstances, as required by Rule 23(a). Further, because of the presence of these multiple defendants "there is no 'single course of conduct,'" which thereby prevents Plaintiffs from satisfying the requirements of 23(b)(2) in respect to their asserted injunctive class. *Ball*, 385 F.3d at 728.

> **A.   Plaintiffs cannot satisfy the typicality requirement of Rule 23(a) because of the differences between the named Plaintiffs and the rest of the putative classes as to exposure.**

Courts have denied class certification based on the failure of plaintiffs to satisfy the typicality requirement of Rule 23(a) because of differences in exposure. For example, in *Blaz v. Galen Hosp. Illinois, Inc.*, 168 F.R.D. 621 (N.D. Ill. 1996), the United States District Court for the Northern District of Illinois (the district where McCullom Lake Village is located) denied class certification to a group of 5,000 plaintiffs who had undergone X-ray treatment therapy at a hospital over a thirty-year period. *Id.* There, the court held that the commonality requirement was satisfied because the radiation treatment was a common course of conduct that affected all members of the class. *Id.* at 624. The typicality requirement, however, was not satisfied because the length of exposure to the radiation as well as the amount of radiation each plaintiff was exposed to varied significantly. *Id.* at 625. Thus, no plaintiff could be a typical representative of this class. *Id.* at 626; *see also Reilly v. Gould*, 965 F. Supp. 588, 597 (M.D. Pa. 1997).

In this case, the putative class representatives' claims cannot be considered to be typical of the class because their alleged "exposure" was different than those of other class members given, at the very least, the amount of time they lived in the Village. For example, Mr. Gates (born in 1945) grew up in McCullom Lake Village and lived there

for over twenty years before Modine allegedly began its release of chemicals; he drank well water throughout that period.  (Hernandez-Malaby Aff., Ex. L.)  Mrs. Gates only moved to the Village in 1966, after the Modine facility began operating, and only then began drinking well water.  (Hernandez-Malaby Aff., Ex. O.)  In contrast, Edwin Begley has lived in the Village only over the past five years and has never regularly consumed well water.  (Hernandez-Malaby Aff., Ex. N.)  Moreover, Mr. Gates apparently visited the Rohm and Haas facility (at least, according to Mrs. Gates) and hauled away dirt from that facility.  (Hernandez-Malaby Aff., Ex. O at 60-61.)  This makes him different than class members, including Mrs. Gates, who had never been to that facility.  That the Gates' well also tested negative for any of the COCs in this case (Hernandez-Malaby Aff., Ex. L and O) also precludes a finding that their claims are at all typical because of the defenses that can be raised by any of the Defendants to their claims.

**B.      The presence of multiple Defendants demonstrates that there is no single course of conduct alleged.**

Plaintiffs' own allegations assert that Modine released different chemicals than did the Rohm and Haas defendants and for a considerably shorter period of time.  Their asserted class definitions, however, take no account whatsoever of those differences.  Thus, even though by Plaintiffs' own pleadings, the defendants have engaged in different courses of conduct over different time frames, Plaintiffs seek to impose unitary class definitions against all defendants.

Under similar circumstances, courts have rejected such bids for certification against multiple defendants in environmental contamination actions.  *Ball*, 385 F.3d at 726-728, is illustrative.  There, the current and former residents of a neighborhood community in Oak Ridge, Tennessee brought an environmental contamination action

against various private contractors and federal agencies operated by Oak Ridge facilities. The Sixth Circuit affirmed the trial court's denial of certification, finding among other things that predominating individual issues were raised by Plaintiffs' request for medical monitoring and clean-up, as each alleged class member's claim was "necessarily proportional to his or her exposure to toxic emissions or waste." *Id.* at 727-28. The Court went on to hold that the presence of multiple defendants further supported the denial of certification: "[T]here are multiple defendants with presumably differing liability levels, if any. Accordingly, there is no 'single course of conduct.'" *Id.* at 728. So too here. There is no single course of conduct sufficient to support certification and Plaintiffs' motion should be denied.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for class certification should be denied.

Dated: February 12, 2007

Respectfully submitted,

Albert G. Bixler (I.D. No. 45639)
Eckert Seamans Cherin & Mellott, LLC
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, PA  19102
(215) 851-8400
*Attorneys for Defendant*
*Modine Manufacturing Company*

Of Counsel:
QUARLES & BRADY LLP
411 East Wisconsin Avenue
Suite 2040
Milwaukee, WI  53202-4497