**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

GLENN GATES and DONNA GATES, h/w     :
on behalf of themselves and all others       :
similarly situated                               :
                                            :
                 Plaintiffs,           :      CLASS ACTION
                                            :
            v.                       :      Civil Action No. 2:06-CV-01743-GP
                                            :
ROHM AND HAAS COMPANY, et al.,      :
                                            :
                Defendants.         :

---

**BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
SUBMITTED BY DEFENDANTS ROHM AND HAAS COMPANY, ROHM AND HAAS
CHEMICALS LLC AND MORTON INTERNATIONAL INC.**

---

Ralph G. Wellington (I.D. No. 10068)
Dennis R. Suplee (I.D. No. 03336)
Jennifer A. L. Battle (I.D. No. 86765)
Stephen A. Fogdall (I.D. No. 87444)
Alison C. Finnegan (I.D. No. 88519)

*Attorneys for Defendants
Rohm and Haas Company,
Morton International Inc., and
Rohm and Haas Chemicals LLC.*

SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Tel. (215) 751-2488; 2068; 2647
Fax (215) 751-2205

Dated: February 12, 2007

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ...................................................................................................................... 1

SUMMARY OF ARGUMENT ................................................................................................. 2

FACTUAL BACKGROUND AND EVIDENTIARY FRAMEWORK ....................................... 5

I.   The Diligent Efforts By Morton And Rohm And Haas To Map And Remediate The
     Groundwater Plume Demonstrate That No Contamination Ever Has Impacted
     McCullom Lake Village ............................................................................................... 6

II.  The Elements Of Plaintiffs' Claims Are Highly Individualized And Not Susceptible
     To Class-Wide Proof ................................................................................................... 9

     A.   Plaintiffs Have Proposed No Clear Definition Of The Class Area ....................... 9

     B.   There Is No Common Chemical .......................................................................... 12

     C.   There Is No Common Exposure .......................................................................... 13

     D.   There Is No Common Basis For Assessing Risk ................................................ 15

     E.   There Is No Common Proof Of Causation .......................................................... 16

     F.   There Is No Common Impact On Property Values .............................................. 18

ARGUMENT ........................................................................................................................... 20

I.   Class Certification Should Be Denied Because Plaintiffs' Proposed Classes Cannot
     Even Be Defined Until The Court Has Heard The Trial On The Merits .......................... 22

II.  Class Certification Should Be Denied Because Plaintiffs Cannot Demonstrate
     Commonality, Typicality And Adequacy Of Representation ........................................... 25

     A.   Plaintiffs Have Failed To Demonstrate That There Are Common Questions
          Of Law Or Fact ................................................................................................. 26

     B.   Plaintiffs Have Failed To Demonstrate That Their Claims Are Typical Of
          Their Proposed Classes ...................................................................................... 31

     C.   Plaintiffs Have Failed To Demonstrate That They Will Adequately Represent
          Their Proposed Classes ...................................................................................... 32

III. The Proposed Property Loss Class Fails The Predominance And Superiority Tests
     Under Rule 23(b)(3) ................................................................................................... 34

A. The Proposed Property Loss Class Fails The Predominance Test..........................34

B. The Proposed Property Loss Class Fails The Superiority Test.............................36

IV. The Proposed Medical Monitoring Class Fails The Requirements For Certification Under Rule 23(b)(2)........................................................................................37

A. Plaintiffs Have Not Demonstrated That The Medical Monitoring They Seek Truly Qualifies As Injunctive Relief......................................................38

B. Plaintiffs' Proposed Medical Monitoring Class Has No Cohesiveness...............40

V. Plaintiffs' Proposed Injunctive Relief Class Is No More Suitable For Certification Than Their Other Proposed Classes..................................................................43

VI. Plaintiffs' Proposed Punitive Damages Class Cannot Be Certified.................................44

CONCLUSION........................................................................................................45

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Agent Orange*, 818 F.2d 145 (2d Cir. 1987) ...................................................... 41

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) ...........................................32, 33, 40

*Arch v. American Tobacco Co.*, 175 F.R.D. 469 (E.D. Pa. 1997) .................................39

*Ardoin v. Stine Lumber Co.*, 220 F.R.D. 459 (W.D. La. 2004) .....................................33

*Ball v. Union Carbide Corp.*, 212 F.R.D. 380 (E.D. Tenn. 2002)....................20, 27, 39

*Barabin v. Aramark Corp.*, 2003 U.S. App. LEXIS 3532 ............................................38

*Barnes v. American Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998) .......................... *passim*

*Black v. The Premier Co.*, 2002 U.S. Dist. LEXIS 26461 (E.D. Pa. Aug. 13, 2002)...................22

*Blain v. Smithkline Beecham Corp.*, 2007 U.S. Dist. LEXIS 5460 (E.D. Pa. Jan. 25, 2007) ...............................................................................................................................29

*Castano v. American Tobacco Co.,* 84 F.3d 734 (5th Cir. 1996) .........................4, 36, 37

*Commonwealth of Puerto Rico v. The M/V Emily S*, 158 F.R.D. 9 (D.P.R. 1994).......................21

*Day v. NLO, Inc.*, 144 F.R.D. 330 (D. Ohio 1992).......................................................29

*In re Fiberboard Corp.*, 823 F.2d 706 (5th Cir. 1990) .................................................26

*Fisher v. CIBA Specialty Chems. Corp.*, 2006 U.S. Dist. LEXIS 48395 (S.D. Ala. July 14, 2006)...............................................................................................20, 30, 35

*Forman v. Data Transfer, Inc.*, 164 F.R.D. 400 (E.D. Pa. 1995) .................................24

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995)................21

*General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147 (1982)........................21, 26

*Hurd v. Monsanto Co.*, 164 F.R.D. 234 (S.D. Ind. 1995)............................................21

*Kline v. Security Guards, Inc.*, 196 F.R.D. 261 (E.D. Pa. 2000) ............................22, 25

*LaBauve v. Olin Corp.*, 231 F.R.D. 632 (S.D. Ala. 2005)............................1, 22, 25, 30

*Martin v. Home Depot U.S.A., Inc.*, 225 F.R.D. 198 (W.D. Tex. 2004)...................................33, 34

*Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910 (7th Cir. 2003) ....................................................36

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 209 F.R.D. 323 (S.D.N.Y. 2002)........33, 43

*Newton v. Merrill Lynch, Pierce Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001) ......................................................................................................4, 21, 22, 36, 37

*Newton v. Southern Wood Piedmont Co.*, 163 F.R.D. 625 (S.D. Ga. 1995) ..........................21, 27

*O'Connor v. Boeing North American, Inc.*, 184 F.R.D. 311 (C.D. Cal. 1998)..............................29

*O'Connor v. Boeing North American, Inc.*, 197 F.R.D. 404 (C.D. Cal. 2000).......................29, 33

*In re Paxil Litig.*, 212 F.R.D. 539 (C.D. Cal. 2003) ....................................................23, 31, 35, 41

*Pelzer v. Lockformer Co.*, 2005 U.S. Dist. LEXIS 14520 (N.D. Ill. Jul. 6, 2005) .......................27

*Reilly v. Gould, Inc.*, 965 F. Supp. 588 (M.D. Pa. 1997)........................................................20, 26

*In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61 (S.D.N.Y. 2002) ....................................11, 32, 39

*In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293 (7th Cir. 1995).....................................................37

*Sanneman v. Chrysler Corp.*, 191 F.R.D. 441 (E.D. Pa. 2000) ....................................................23

*In re School Asbestos Litig.*, 789 F.2d 996 (3d Cir. 1986) ............................................................28

*In re St. Jude Medical, Inc.*, 425 F.3d 1116 (8th Cir. 2005)..............................................39, 40, 42

*Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598 (5th Cir. 2006) ...................2, 20, 35, 36

*Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988)..................................................36

*Thomas v. FAG Bearings Corp., Inc.*, 846 F. Supp. 1400 (M.D. Mo. 1994) ...................13, 21, 30

*Thompson v. American Tobacco Co.*, 189 F.R.D. 544 (D. Minn. 1999) .......................................33

*Webb v. Merck & Co.*, 206 F.R.D. 399 (E.D. Pa. 2002)................................................................26

*Yslava v. Huges Aircraft Co.*, 845 F. Supp. 705 (D. Ariz. 1993) .................................................29

## STATE CASES

*DiGregorio v. Keystone Health Plant Trucking Co.*, 840 A.2d 361 (Pa. Super. Ct. 2003)...........44

*Dillon v. Evanston Hosp.*, 199 Ill. 2d 483, 771 N.E.2d 357 (2002)...............................................32

*Kleinworth Benson North America, Inc. v. Quantum Fin. Servs., Inc.*, 692 N.E.2d 269 (Ill. 1998) ...........................................................................................................................44

*Jensen v. Bayer AG,* 2007 Ill. App. LEXIS 74 (Ill. App. Ct. Feb. 2, 2007) ..................................27

*Leach v. E.I. DuPont de Nemours & Co.*, 2002 WL 1270121 (W. Va. Cir. Ct. April 10, 2002) .............................................................................................................................29

*Mason v. Parker*, 295 Ill. App. 3d 1096, 695 N.E.2d 70 (1998) ............................................32, 33

*Redland Soccer Club, Inc. v. Dep't of the Army*, 548 Pa. 178, 696 A.2d 137 (1997) ..................27

*Spinelli v. Maxwell*, 430 Pa. 478 (1968) ....................................................................................32

## FEDERAL RULES

Fed. R. Civ. P. 23 .................................................................................................... *passim*

Fed. R. Civ. P. 65 ....................................................................................................................43

## MISCELLANEOUS

Federal Judicial Center, Manual for Complex Litigation (4th ed. 2004).....................................2, 4

Appraisal Institute, The Appraisal of Real Estate (12th ed. 2001) ................................................19

## INTRODUCTION

Plaintiffs erroneously assert contamination of air and groundwater in McCullom Lake Village by volatile organic compounds allegedly originating from defendants' facilities (located more than a mile away), ignoring test results from 37 wells in the Village that have detected **no** such chemicals.[1]  Plaintiffs maintain -- with no supporting facts or testimony -- that this supposed exposure has caused an alleged cluster of brain and pituitary cancers in the Village and that every current or former resident is at a "heightened risk" of developing brain cancer as a result.  Yet plaintiffs can point to nothing in the class certification record that would permit this Court to conclude that these allegations can be established on a class-wide basis.  Instead, plaintiffs ask this Court to take it on faith that they will demonstrate the appropriateness of class certification when the merits of their claims are tried.  The Court should reject this "presumptuous 'shoot first, ask questions later' approach to class certification."  *LaBauve v. Olin Corp.,* 231 F.R.D. 632, 664 (S.D. Ala. 2005).

Plaintiffs' experts have admitted that putative class members would have been exposed -- if at all -- to different chemicals, in different concentrations, from different defendants, for different amounts of time.  Plaintiffs' experts also have made clear that it would be impossible for putative class members to make the particularized showing of individual risk that any claim for medical monitoring would require -- if plaintiffs even have such a claim under Illinois law, which is highly doubtful -- without investigating *each* putative class member's physiological resistance or susceptibility to each chemical, their medical history, family history, lifestyle, water consumption habits, and numerous other unique individual risk factors.  Hence,

---

[1]    Specifically, plaintiffs allege that wells in the Village are contaminated with trichloroethene ("TCE"), 1,1-dichloroethylene or vinylidene chloride ("1,1-DCE") and/or vinyl chloride ("VC").  **None** of these chemicals ever has been detected in Village wells.

any supposed "class" trial on these issues would quickly "degenerate in practice into multiple lawsuits separately tried,"[2] and certifying plaintiffs' proposed classes would prove pointless. The motion for certification should be denied.

## SUMMARY OF ARGUMENT

Plaintiffs have moved for certification of four putative classes of current and former residents and property owners in McCullom Lake Village seeking medical monitoring, property loss damages, injunctive relief and punitive damages.  None of these four classes can be certified.

First, nothing could be more fundamental to class certification than "precise, objective and presently ascertainable" definitions of the proposed classes.[3]  Yet nowhere in plaintiffs' original complaint or amended complaint, their 51-page motion for class certification, or their four expert reports have they made any attempt to accurately and objectively delineate the classes they purport to represent.  Plaintiffs propose to represent only those individuals who actually have been exposed to TCE, 1,1-DCE or VC originating from defendants' facilities, yet admit they will have no evidence of who these individuals are until their experts have testified at trial -- thus deferring to final adjudication the very definition of the classes whose claims are to be litigated.  This puts the cart before the horse:  no one can say who is, or is not, in plaintiffs' proposed classes until the case has been decided.

---

2    *Steering Committee v. Exxon Mobil Corp.,* 461 F.3d 598, 604 (5th Cir. 2006) (quoting Fed. R. Civ. P. 23 advisory committee notes).

3    Federal Judicial Center, Manual for Complex Litigation § 21.222 (4th ed. 2004).

Second, plaintiffs cannot satisfy the commonality, typicality and adequacy requirements of Rule 23(a). There can be no "common questions" among putative class members because the evidence concerning each individual's alleged exposure to chemicals, and the "heightened risk" that supposedly results, could never apply in the same way to each class member. Plaintiffs concede that each individual would have been exposed to different chemicals, in different concentrations, from different defendants, for different amounts of time. Thus, evidence relating to one putative class member shows nothing as to any other putative class member. Nor can plaintiffs satisfy the requirements of typicality or adequacy of representation when they have chosen to sue only for medical monitoring and property loss, and to forgo all claims for personal injuries -- a decision that other putative class members may not wish to make, and may come to regret should they attempt to assert such claims later and find them extinguished.

Third, plaintiffs' proposed property loss class fails the predominance and superiority tests under Rule 23(b)(3). The Court cannot resolve any putative class member's individual claim without evaluating disputed fact and expert testimony as to whether a particular property ever was contaminated with chemicals from defendants' facilities and, if so, how that could have affected the value of the property. Any "class" trial on these issues would be impossible. Moreover, the "superiority" of class litigation has not been demonstrated when plaintiffs' claims rest on the same undeveloped allegations of exposure and causation asserted in sixteen individual lawsuits filed by plaintiffs' counsel in the Court of Common Pleas of Philadelphia County. These lawsuits are a far better way to litigate the alleged contamination in

the Village -- which tests from 37 wells have failed to detect -- than attempting an unmanageable class action without any assurance that plaintiffs' claims have any merit.[4]

Fourth, plaintiffs' claims for medical monitoring cannot be certified under Rule 23(b)(2).  Plaintiffs have made no effort even to *describe* the medical monitoring regime they seek, and their purported claims for medical monitoring -- which Illinois law may not even recognize -- are so saturated with individual issues relating to putative class members' exposure, physiology, medical history, lifestyle and consumption habits that the proposed medical monitoring class lacks the "cohesiveness" necessary for certification under Rule 23(b)(2).

Fifth, plaintiffs' proposed "injunctive relief class" seeking abatement of alleged contamination from putative class members' properties and an order requiring defendants to connect the Village to a municipal water supply cannot be certified.  Whether individual putative class members would be entitled to such relief raises the same unmanageable complexities -- the same requirement of individual submissions of fact and expert testimony for each class member -- as plaintiffs' claims for medical monitoring and property loss.

---

[4]    Courts typically hold that only "mature" torts are suitable for class treatment.  *See, e.g., Newton v. Merrill Lynch, Pierce Fenner & Smith, Inc.,* 259 F.3d 154, 168 (3d Cir. 2001) ("[A] mass tort cannot be properly certified without a prior track record of trials from which the district court can draw the information necessary to make the predominance and superiority analysis required by Rule 23.  This is because certification of an immature tort results in a higher than normal risk that the class action may not be superior to individual adjudication.") (quoting *Castano v. American Tobacco Co.,* 84 F.R.D. 734, 747 (5th Cir. 1996)); *see also* Manual for Complex Litigation § 22.314 ("Litigation is generally considered mature if though previous cases (1) discovery has been thorough, producing a consensus that the available information has been provided, (2) a number of verdicts have been received indicating the value of claims, and (3) *plaintiffs' contentions have been shown to have merit.*") (emphasis added).  Plaintiffs' claims here are plainly immature because the individual state court plaintiffs represented by plaintiffs' counsel have yet to develop any evidence establishing that they ever were exposed to chemicals originating from defendants' facilities, or that such exposure could cause any injury.  Indeed, to our knowledge, no plaintiff in any jurisdiction ever has obtained a verdict in his or her favor based on environmental exposure to the chemicals alleged here.

Sixth, and finally, plaintiffs' proposed punitive damages class is not fit for certification. Putative class members have no independent claim for punitive damages. Hence, because plaintiffs' other proposed classes cannot be certified, their proposed punitive damages class must suffer the same fate.

## FACTUAL BACKGROUND AND EVIDENTIARY FRAMEWORK

We briefly recount here the history of Morton's and Rohm and Haas's efforts to investigate, contain and remediate groundwater contamination associated with their facility.[5] As this history shows, these efforts have been conducted with constant input and approval from the Illinois Environmental Protection Agency (IEPA) and have verified that this contamination is not moving toward McCullom Lake Village, and no resident, drinking water well or property in the Village ever has been impacted. This conclusion is further confirmed by the 30 well test samples plaintiffs themselves have taken, and the 9 samples taken by the County, that have detected *no* contamination by TCE, 1,1-DCE or VC.

We also set forth here an overview of the record compiled by the parties during class discovery. This record demonstrates that plaintiffs can meet none of the requirements for class certification under Rule 23. Where appropriate, we have organized this discussion according to the necessary elements of plaintiffs' proof so as to present the pertinent facts in the context of Rule 23's requirements.[6]

---

[5]     Generally, we refer to defendants Rohm and Haas Company, Rohm and Haas Chemicals LLC and Morton International Inc. collectively as "Rohm and Haas." However, in this section we refer to Morton and Rohm and Haas separately where appropriate. Rohm and Haas acquired Morton in 1999.

[6]     In support of this brief, we submit reports by: Robert D. Mutch, Jr., P.HG, P.E., a hydrogeologist (attached as Exhibit A); Peter J. Drivas, Ph.D., an air quality expert

I.    **The Diligent Efforts By Morton And Rohm And Haas To Map And Remediate The Groundwater Plume Demonstrate That No Contamination Ever Has Impacted McCullom Lake Village.**

In 1983, Morton discovered ammonium chloride in a well at the facility. Although Morton had seen earlier indications of ammonium chloride leaching from its on-site landfill into a pond system on the surface, this was the first indication that there might be contamination of the site's water supply.  *See* Deposition of former Morton plant manager Sidney G. Martin ("Martin Dep.") at 62:8-15, 280:11-21, attached as Exhibit G.  Plaintiffs acknowledge that Morton immediately notified the IEPA of this finding.  Mem. at 7.  Morton also took immediate steps to assess the contamination by hiring an environmental consulting firm to conduct an extensive investigation of the facility.  Martin Dep. at 66:17-70:16.  That investigation revealed a "plume" of chemicals beneath the site following the natural movement of the groundwater to the east and then to the southeast, a finding subsequent investigations have consistently confirmed.  *See* Deposition of Stanislaus J. Zagula, environmental manager of the Rohm and Haas facility, at 104:2-105:2, attached as Exhibit H.  Since 1983, more than twenty monitoring wells have been drilled on the site and the surrounding area.  The general shape, direction and contents of the plume are now established.  As the attached maps show, the plume lies northeast of the Village, nearly a mile away.  *See* Exhibit I.

Since 1991, the site has been enrolled in a voluntary remediation program under the auspices of the IEPA.  Under this program, the IEPA has approved every aspect of Morton's

---

(attached as Exhibit B); Darrell D. Bigner, M.D., Ph.D., a neuropathologist (attached as Exhibit C); Peter A. Valberg, Ph.D., a toxicologist (attached as Exhibit D); Patricia Buffler, M.P.H., Ph.D, an epidemiologist (attached as Exhibit E); and Richard J. Roddewig, a real estate appraiser (attached as Exhibit F).

and Rohm and Haas's remediation efforts, has conducted regular site visits, and is kept constantly updated on the site's progress.

Initially, Morton installed a pump-and-treat system to extract and aerate contaminated groundwater to remove volatile organic compounds (a process known as an "air stripper").[7]  In 2004, Rohm and Haas upgraded the system by installing three new extraction wells and a state of the art water treatment system designed to handle both the pumped groundwater and the plant's wastewater.

Plaintiffs erroneously suggest that despite these efforts, the extent of the plume is "not known" and that the pump-and-treat systems have "not contain[ed] the groundwater contamination."  Mem. at 15.  But plaintiffs' own test samples from 6 wells taken in April 2006, before they filed this lawsuit, and then 24 additional wells in January 2007, confirm that the plume does not impact the Village.  Moreover, plaintiffs' hydrogeology expert James Gregory Hill admitted this in his deposition and conceded that Rohm and Haas's extraction wells would have had a significant impact in arresting the spread of contamination.  Hill Dep. at 239:8-240:15, attached as Exhibit J.

Instead, Mr. Hill has focused on a different theory:  he concedes that the current plume does not reach the Village, but theorizes -- with no supporting evidence -- that a different plume could have originated from Morton's on site landfill during its operation from 1961 to

---

[7]     Plaintiffs erroneously assert that this "air stripper" caused airborne contamination to reach the Village.  Mem. at 15.  As defendants' air expert, Dr. Drivas, shows in his report, attached as Exhibit B, even under worst case assumptions, "long term air concentrations of 1,1-dichloroethene and vinyl chloride in the vicinity of McCullom Lake Village . . . are well below conservative health-based limits established by the USEPA," indeed, "far lower, by factors of 700 to 3000, than the USEPA health-based benchmarks."  Drivas Report at 1.  Plaintiffs have submitted no counter opinion or facts.

1978.  Hill Dep. at 62:5-66:5.  Mr. Hill speculates that the landfill could have had a "mounding" effect, altering the ordinary flow of the groundwater and redirecting it toward the Village.  *Id*. at 86:9-89:3, 220:8-223:23.  This theory is flawed on multiple levels.

First, as Mr. Hill has conceded, he has no idea whether such alleged "mounding" took place because he has yet to develop the model he would present at trial, and he is aware of no facts at present to corroborate his theory.  *Id*. at 62:5-66:5, 89:4-16.

Second, Mr. Hill has no evidence that volatile organic compounds were ever placed in the landfill in measurable quantities.  To the contrary, at most only trace amounts of vinylidene chloride would have been deposited in the landfill in the "wash water" used to rinse chemical reactors.  Martin Dep. at 300:10-25, attached as Exhibit G; Deposition of former Morton plant manager Daniel M. Schmitt at 39:11-40:7, 40:11-42:21, attached as Exhibit K.  Thus, even if the "mounding" effect of the landfill could be established, this theory would provide no support for plaintiffs' allegation that drinking water wells in the Village ever were contaminated with significant quantities of TCE, 1,1-DCE or VC.

Third, as defendants' hydrogeology expert Robert Mutch explains, even with worst case assumptions about chemicals leaching out of the landfill, the volume of material in the landfill could never have had an appreciable impact on the natural flow of groundwater.  *See* Mutch Report at 4-4 – 4-10, attached as Exhibit A.

In short, Morton and Rohm and Haas, under the supervision of the IEPA, have carefully studied groundwater contamination and have taken aggressive steps to contain it.  Plaintiffs have no evidence -- and indeed there much to the contrary -- that any contamination originating from the facility has ever reached any well in McCullom Lake Village.

8

## II.      The Elements Of Plaintiffs' Claims Are Highly Individualized And Not Susceptible To Class-Wide Proof.

Plaintiffs argue that the so-called "class" trial they propose will produce "one answer, and it will be applied with equal force to the claims of all Class members, who will then use that answer to calculate their individual damages, if any." Mem. at 47. But the affidavit and deposition testimony of plaintiffs' own experts, as well as the reports of defendants' experts submitted with this brief and the briefs of the other defendants in this action, demonstrate that there cannot be "one answer" for each putative class member. Rather, plaintiffs' experts concede that each putative class member would have been exposed, if at all, to different chemicals, in different concentrations, from different defendants, for different amounts of time; each would have his or her own unique physiological resistance or susceptibility to the effects of these chemicals; and each would have his or her own medical history, lifestyle and consumption habits. There simply is no single "danger point" of exposure that could apply to each putative class member. Likewise, individual putative class members' claims for property loss could never be proved on a class-wide basis.

### A.      Plaintiffs Have Proposed No Clear Definition Of The Class Area.

It is a bedrock rule that a class cannot be certified unless the Court can ascertain at the outset of the litigation just who is and who is not in the class. Plaintiffs' proposed classes fail this basic prerequisite.

In plaintiffs' amended complaint, the proposed classes "consist[] of those persons who currently own property in or reside in, or in the past owned or resided in property that *has been impacted by toxic contamination from defendants' properties*." Amended Complaint ¶ 109

(emphasis added).  This requires a determination of which properties have, and which have not, been "impacted by toxic contamination."  But plaintiffs' experts have made no attempt to say which properties they believe have been affected by chemical exposure.  Plaintiffs' hydrogeologist asserts only that he "*will* develop [a] three dimensional computer simulation of groundwater flow," Hill Aff. at 11, attached as Ex. A to Mem. (emphasis added), and plaintiffs' air modeling expert asserts that their "air pollution claims . . . *can* be objectively evaluated using reliable, well-established, and EPA approved tools."  Zannetti Aff. ¶ 10, attached as Ex. B to Mem. (emphasis added).  Thus, on plaintiffs' proposal, the Court could ascertain whether a particular individual is a class member only after (i) plaintiffs' experts have constructed their theoretical groundwater and air models; (ii) those models suggest that the individual did indeed reside in a region allegedly impacted by contamination; and, most importantly, (iii) this Court *accepts the conclusions of these models as applied to that individual* -- in short, only after ruling on the merits of the individual putative class member's claim.  This is a thoroughly backwards approach to class certification, and the Court should reject it.

In their motion for class certification, plaintiffs offer new proposed class definitions that fare no better on this score.  In the motion, plaintiffs propose to represent "current and former residents of McCullom Lake Village ***exposed to*** TCE, 1,1-DCE and/or vinyl chloride originating from defendants' properties."  Mem. at 25 (emphasis added).  But plaintiffs make no attempt to demonstrate how an individual's membership in such a proposed class could be ascertained without a hearing on the merits to determine whether that individual indeed had been "exposed to TCE, 1,1-DCE and/or vinyl chloride originating from defendants properties."

Nor is this the only respect in which plaintiffs' proposals are inherently ill-defined.  Plaintiffs maintain that they represent in this action only individuals seeking medical

monitoring for brain cancer and that they have "expressly exclude[ed]" anyone alleging

"personal injuries caused by defendants."  Mem. at 48.  But plaintiffs cannot "expressly exclude"

such individuals.  If their proposed medical monitoring class were limited only to

"asymptomatic" individuals, then membership in the class could not be ascertained without a

separate medical examination of each putative class member to determine whether he or she is

complaining of health problems.[8]  Nor could this problem be solved by inviting individuals who

wish to assert personal injury claims to self-identify by opting out of the class, because plaintiffs

seek to certify their proposed medical monitoring class under a provision of Rule 23 *which

prohibits opting out*.[9]

   This leaves the status of some putative class members completely up in the air.

While some residents of McCullom Lake Village say they have no medical condition allegedly

caused by defendants, *see* Deposition of Edwin Begley ("Begley Dep."), at 38:11-17, 42:5-10,

attached as Exhibit L, others have expressed concern about health problems they or their families

have experienced.  *See* Deposition of Joseph Zakrocky ("Zakrocky Dep.") at 35:3-10, attached as

Exhibit M; *see also* Deposition of Gary Ginsberg ("Ginsberg Dep.") at 30:1-20, attached as

Exhibit N.  It is entirely unclear whether the latter residents are in plaintiffs' proposed medical

monitoring class:  on the one hand, plaintiffs *say* they are "expressly exclude[ed]," but do not

---

[8] *Cf. In re Rezulin Prods. Liab. Litig.,* 210 F.R.D. 61, 74 (S.D.N.Y. 2002) ("[T]he questions whether an individual is asymptomatic or has manifested physical injury can be determined only by a physician.  And a class definition that calls for a medical conclusion based on plaintiff-specific information is an improper basis for maintaining a class action.") (internal quotation marks omitted).

[9] Plaintiffs request certification of their proposed medical monitoring class under Rule 23(b)(2).  Under this provision, "unnamed members are bound by the action without the opportunity to opt out."  *See, e.g., Barnes v. American Tobacco Co.,* 161 F.3d 127, 142-43 (3d Cir. 1998).

explain how; on the other hand, these residents cannot opt out and there is no manageable way to define the class so that it does not contain them.

In short, plaintiffs' proposed classes are so poorly defined that they cannot say whether even the individuals that they themselves have identified and produced as putative class members would be included.  No class can be certified in these circumstances.

## B.      There Is No Common Chemical.

Plaintiffs' motion for class certification focuses on three chemicals -- TCE, 1,1-DCE and VC -- which, on their own allegations, have very different health effects.  Plaintiffs allege that "VC exposure can cause, among other things, liver and brain cancers."  Amended Complaint ¶ 67.  By contrast, plaintiffs do not allege that exposure to TCE or 1,1-DCE can cause brain cancer.  *Id.*

In addition to these three chemicals, plaintiffs suggest in other submissions to this Court that several other chemicals might be at issue.  For example, in response to the motion for summary judgment filed by defendants Huntsman Corporation and Huntsman International LLC, plaintiffs asserted for the first and only time -- and with no support -- that "proof of benzene . . . in the wells of McCullom Lake Village would still fall under the language of the Amended Complaint and provide a basis for finding in favor of the plaintiffs."  Plaintiffs' Response in Opposition at 10.

Plaintiffs have tried to find evidence of "contamination" by still more chemicals in the 39 well test results taken by plaintiffs and the County -- ***all*** showing ***no*** contamination in the Village of the chemicals identified in their complaint, or of benzene -- which plaintiffs now

assert show contamination by fluoride, TCA, ammonia and chloride (salt).  Plaintiffs'
hydrogeology expert Hill admits that it is "unlikely" that the trace TCA detected by the County
in one well came from any of defendants' facilities.  Hill Dep. at 70:2-71:17, attached as Exhibit
J.  And in commenting on the 24 new tests from January, Hill states that "it cannot be
definitively concluded that the chloride and ammonia collected in plaintiffs' well testing data
comes from defendants' facilities."  *See* Letter from James Gregory Hill dated February 2, 2007,
attached as Exhibit O.[10]

    Given the wide range of chemicals that plaintiffs allege are at issue (at least three;
potentially seven or more), and the wide variability of concentrations of these chemicals, if any,
that would be detected in putative class members' wells, the following is clear:  if any putative
class members ever were exposed -- which we deny -- they would have been exposed to different
chemicals, in different concentrations, from different defendants, for different amounts of time.
Furthermore, each putative class member would have to assert a different range of alleged
adverse health risks based on their exposure, if any, because plaintiffs themselves allege that
these chemicals vary widely in their effects.  Amended Complaint ¶ 67.

**C.    There Is No Common Exposure.**

    Likewise, the record contains no evidence of a common *level* of exposure (of
whatever chemical) applicable to each class member.  The well test results consistently show that
there is no contamination in the Village.  And neither Mr. Hill nor Dr. Zannetti provides any

---

[10]    Hill also recognizes that the detections of chloride and ammonia vary widely across the
wells tested.  *Id.*  Indeed, only one of these results exceeds the 250 mg/L standard for
chloride; the others are far below that benchmark.  Nor is this variation at all surprising,
given the "complex nature of hydrogeology."  *Thomas v. FAG Bearings Corp., Inc.,* 846
F. Supp. 1400, 1404 (M.D. Mo. 1994) (denying class certification).  Such results may
always be expected to "vary markedly from well to well."  *Id.*

reason to suppose that their theoretical models would show that each putative class member, or their property, would be exposed to the same concentrations of chemicals, for the same amount of time.  To the contrary, Mr. Hill has acknowledged that "[i]t's certainly possible that there will be differing levels of contamination [in different putative class members' wells] . . . . That's yet to be determined."  Hill Dep. at 143:17-145:7, attached as Exhibit J.

Indeed, as Rohm and Haas's hydrogeology expert Mr. Mutch and air expert Dr. Drivas make clear in their reports, any exposure that individual putative class members could have experienced -- and we deny that there is any -- could never be uniform.  Rather, as Dr. Drivas explains, any emissions from the Rohm and Haas site would have varied over time, and always would be "far lower, by factors of 700 to 3000, than the USEPA health-based benchmarks."  Drivas Report at 1, 6-7, attached as Exhibit B.  Thus, any particular resident's alleged "exposure" to such emissions would depend greatly on when (and for how long) that individual resided in the Village.  Moreover, because "individuals spend time in various locations," "the amount of time spent indoors vs. outdoors [would] need to be estimated for each individual, since indoor concentrations are typically lower than outdoor concentrations."  Drivas Report at 2.  Hence, each individual putative class member would "need a separate calculation to generate a representative air exposure, using air concentrations and times at several different locations."  *Id.*  Compounding this highly particularized inquiry, each individual's "dose" would also be a function of his or her own physiology, including body weight and breathing rate. Ginsberg Dep. at 134:18-139:5, 229:19-235:1, attached as Exhibit N.  As Rohm and Haas's toxicology expert Dr. Peter Valberg explains, this wide variation in individual putative class members inhaled and ingested doses makes any attempt to define the "typical" or "average"

14

health risk to individual Village residents meaningless.  *See* Valberg Report at 10-11, attached as Exhibit D.

Similarly, as Mr. Mutch explains, if any residential wells in McCullom Lake Village ever were contaminated by chemicals from defendants' facilities -- which we deny -- such contamination necessarily would vary from well to well:  "residential wells within the community derive their water from different aquifers," and "were constructed at various times . . . Consequently, some wells may not have been affected at all [by the contamination Hill theorizes] and others would have been affected to varying degrees."  Mutch Report at 4-15.

Likewise, residents' exposure to alleged well contaminants would depend on their own personal consumption habits.  For example, one current resident, Edwin Begley, has testified that he and his family have drunk bottled water since moving into the Village five years ago.  *See* Begley Dep. at :23:16-24:8; 26:7-20, attached as Exhibit L.  By contrast, another Village resident, Joseph Zakrocky, has testified that he and his family frequently drink well water.  *See* Zakrocky Dep. at 18:16-24, 55:23-56:13, attached as Exhibit M.  As plaintiffs' toxicologist Dr. Ginsberg conceded, "[t]he ingestion pathway would be less in . . . people," such as Mr. Begley and his family, as compared with Mr. Zakrocky and his family.  Ginsberg Dep. at 186:18-187:2, attached as Exhibit N.

## D.     There Is No Common Basis For Assessing Risk.

Plaintiffs have not and cannot offer any expert testimony demonstrating that exposure to TCE, 1,1-DCE or VC creates *any* "heightened risk" of developing brain cancer, let alone a uniform risk that could apply to every putative class member.  As defendants' neuropathology expert Dr. Darell Bigner explains, the only known cause of brain cancer is

exposure to ionizing radiation.  There is no scientific basis to plaintiffs' contentions that these chemicals can cause or contribute to brain cancer.  Bigner Report at 6, 7, 37-38, attached as Exhibit C.

Indeed, even plaintiffs' toxicologist Dr. Ginsberg *admits* that "vinyl chloride by itself is unlikely to cause cancer."  Ginsberg Dep. at 237:11-238:20, attached as Exhibit N.  As he explained, the enzyme that converts VC into a carcinogenic compound "is known to be generally present in the population with some variability, about six-fold across the population.  There are genetic polymorphisms which would potentially *make the enzyme express more in some individuals than others*."  *Id.* at 58:5-59:24 (emphasis added).  Compounding this variation, individual members will also differ widely in how their own physiologies *repair* the damage caused by activated VC, a process governed by a separate "DNA excision repair enzyme."  *Id.* at 229:19-230:21.  Thus, according to plaintiffs' toxicologist, the "carcinogenicity of the chemicals of concern," which plaintiffs erroneously assert may be proved without "review of individual circumstances," Mem. at 34, is in fact highly dependent upon each putative class member's level of activation and DNA repair.  "***Not everyone has the same level of activation and repair***."  *Id.* at 231:12-25 (emphasis added).

**E.     There Is No Common Proof Of Causation.**

Plaintiffs could never prove on a class-wide basis that defendants caused contamination of properties or wells in the Village.  ***All individual well tests in the Village have shown that there is no contamination.***  And if contamination ever were discovered in an isolated well, that finding would only raise unique issues concerning on-site sources for that contamination.  As Mr. Mutch explains:

> [C]ommunities like McCullom Lake Village that rely on private wells and on-site septic systems are particularly susceptible to groundwater contamination from their own septic waste . . . . In communities with small lot sizes [such as McCullom Lake Village], there is simply not enough distance for natural attenuation to occur before the septic system-impacted groundwater is intercepted by a neighbor's well, used for potable and other uses, and then discharged once again in the septic system and the cycle repeated.
>
> Volatile organic compounds are recognized to be a particular problem. The volatile organic compound problem stems from the use of solvents in septic system cleaners and many household cleaning fluids. Septic system cleaners containing solvents were commonly used to "rehabilitate" clogging septic systems. Household cleaning solutions contain a variety of chlorinated and non-chlorinated solvents and end up being flushed down the drain to the septic system.

Mutch Report at 4-16 – 4-17, attached as Exhibit A. Significantly, plaintiff Glenn Gates testified in his deposition that on more than one occasion septic systems in the Village failed, causing significant flooding of his and others' properties. He also noted that the "septic fields and wells" in the Village are "right on top of one another." Deposition of Glenn Gates ("Gates Dep.") at 20:3-21:16, attached as Exhibit P.

Plaintiffs' claim for medical monitoring -- if indeed they have such a claim under Illinois law, which is highly doubtful -- likewise would demand individual proof of causation for each putative class member. *See, e.g., Barnes,* 161 F.3d at 145 (each class member "must demonstrate that defendants' intentional or negligent nicotine manipulation caused [him or her] to have a significantly increased risk of contracting serious latent diseases thereby demonstrating the need for medical monitoring"). Plaintiffs erroneously assert that this "question of a causal link between exposure and increased risk" is common to all putative class members because their experts' testimony on this issue "will be based not on review of individual circumstances but on published literature regarding the effects of exposure." Mem. at 34. But this statement seriously

misstates plaintiffs' burden of persuasion under *Barnes*.  As defendants' epidemiologist Dr. Patricia Buffler explains, the proof of causation that *Barnes* mandates would require an "individual-level study with exposure data for the individual cases," though she emphasizes that *no* such study indicates that exposure to VC can cause or create a risk for brain cancer.  Buffler Report at 8, 9-12, attached as Exhibit E.

Even plaintiffs' toxicologist Dr. Ginsberg concedes that any attempt to establish the "causal link between exposure and increased risk" would require analysis of a multitude of individual factors.  He admits that "cancer is multifactorial and . . . along with vinyl chloride exposure there may be other factors that could contribute to the overall risk in an individual." Ginsberg Dep. at 138:12-24, attached as Exhibit N.  And he testified that these "other factors" are "on an individual basis germane to **[a]** *person's standing in terms of whether or not they would have a case for cause and effect.*"  *Id.* at 135:20-137:14 (emphasis added).

In short, plaintiffs cannot prove that defendants caused *each* putative class member to have a significantly increased risk of developing brain cancer without offering an individualized analysis for each that would undermine class certification.

F.      **There Is No Common Impact On Property Values.**

Plaintiffs have offered no fact or expert testimony at all relating to their proposed property loss class, and certainly none suggesting that any properties in McCullom Lake Village require remediation or have lost value as a result of alleged contamination.

By contrast, defendants' real estate valuation expert Richard Roddewig demonstrates that there could be *no* classwide proof to support plaintiffs' allegations of property

loss.  The Village is extremely diverse, containing approximately 465 properties with residential, multi-family, industrial, commercial, and agricultural uses.  *See*  Roddewig Report at ¶ 7.A, attached as Exhibit F.  These 465 properties exhibit considerable socioeconomic variation, *id.* at ¶ 7.J.2, "creat[ing] variability in the ways [these properties might] react to various market influences, including [alleged] environmental contamination."  *Id.* at ¶ 7.K.

Furthermore, "[t]here is no 'common' or 'typical' method to measure impairment that can be applied uniformly and consistently in the purported class area . . . . As stated in the 12th Edition of *The Appraisal of Real Estate,* '[c]urrently a diverse array of techniques are being used to value contaminated properties, and the evolution of a standardized approach to the challenges presented by such assignments is unlikely.'"  *Id*. at ¶ 8.D.  Thus, each putative class member's property would have to be assessed according to the valuation methodology uniquely appropriate to it.

\* \* \*

In sum, there simply is no basis in the record to assert, as plaintiffs do, that "[t]here will be one answer" in their proposed "class" trial that could be "applied with equal force to the claims of all Class members."  Mem. at 47.  Quite the opposite:  each individual's claim must be separately analyzed, taking into account unique facts about that individual alleged exposure, physiology, medical history, lifestyle and consumption habits; and the unique impact, if any, of contamination on the value of that individual's property.

Thus, plaintiffs' motion for class certification must be denied.

**ARGUMENT**

It is well established that

> [a] "mass accident" resulting in [alleged] injuries to numerous persons is
> ordinarily not appropriate for a class action because of the likelihood that
> significant questions, not only of damages but of liability and defenses to
> liability, would be present, affecting individuals in different ways.  In
> these circumstances an action conducted nominally as a class action would
> degenerate in practice into multiple lawsuits separately tried.

*Steering Committee,* 461 F.3d at 604 (quoting advisory committee notes to Rule 23).  As in

*Steering Committee,* plaintiffs "have not demonstrated that this mass tort has any exceptional

features that warrant departing from the general rule and treating it as a class action."[11]  *Id.*

---

[11]     Courts routinely refuse to certify classes in actions, such as this one, alleging air or
groundwater contamination in the community surrounding an industrial site.  *See, e.g.,*
*Steering Committee,* 461 F.3d at 603 ("While it is certainly true that the cause of the fire
[that allegedly released airborne contaminants from the plant] is an issue common to the
class, each individual plaintiff must meet his or her own burden of medical causation,
which in turn will depend on any number of the factors enumerated by the experts who
testified at the class certification hearing."); *Fisher v. CIBA Specialty Chems. Corp.,* 2006
U.S. Dist. LEXIS 48395, *102 (S.D. Ala. July. 14, 2006) ("[T]he existence and degree of
[defendant's] liability to a particular plaintiff will turn on . . . individual-specific
questions," including "whether that plaintiff's property is contaminated," "whether the
source of those contaminants is Ciba's McIntosh site, or whether there is a property-
specific alternative source," and "whether the contamination is sufficiently severe to
reduce the property's value and, if so, the extent of that diminution in value"); *LaBauve,*
231 F.R.D. at 673 ("Whether a plaintiff's property is contaminated, the source(s) of such
contamination, the extent of such contamination, the cause and timing of harm, and the
resulting damage (measured in diminution of property value) are all questions that will
require plaintiff-by-plaintiff scrutiny."); *Ball v. Union Carbide Corp.,* 212 F.R.D. 380,
391 (E.D. Tenn. 2002) ("Issues relating to exposure will vary greatly among the class
members depending on a variety of individualized factors such as time, level, and
duration of exposure, family medical history, dietary habits, age, and place of
residence."); *Reilly v. Gould, Inc.,* 965 F. Supp. 588, 598 (M.D. Pa. 1997)
("[C]ommonality does not exist here.  True, all plaintiffs are said to have been exposed to
lead emission from the site, but whether and to what extent the emissions are said to have
affected each class member is not common to all involved.  Furthermore, assuming
arguendo that the plaintiffs possess common claims which contain common issues of law

Plaintiffs' own expert witnesses, to the extent they have offered any evidence at all of what their testimony might be at trial, have made clear that individual putative class members could not prove their individual claims without introducing expert testimony as to the amount and duration of each individual's alleged exposure to chemicals originating from defendants' facilities and the degree to which such exposure increases that class member's risk of developing brain cancer, taking into account the unique facts of his or her alleged exposure, physiology, medical history, lifestyle and consumption habits.

"[T]he party advocating certification bears the burden of proving appropriateness of class treatment." *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig*., 55 F.3d 768, 792 (3d Cir. 1995). "Actual, not presumed conformance with Rule 23(a) remains . . . indispensable." *Newton,* 259 F.3d at 167 (quoting *General Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 160 (1982)). While the Court may not reach the merits of plaintiffs' claims at the class certification stage, the Court must "probe beyond the surface of plaintiffs' allegations," scrutinize the evidence and "envision the form that a trial on [class] issues would take." *Newton,*

---

or fact, such issues are altered or changed by the individual facts and situation of each plaintiff. This destroys anything common to the class."); *Newton v. Southern Wood Piedmont Co.,* 163 F.R.D. 625, 632 (S.D. Ga. 1995) ("The type of questions which must be answered in order to determine the members of [the putative] class are of a highly individualized nature . . . : (i) the length of time a particular plaintiff resided in the area near the . . . site; (ii) the duration of exposure to the chemicals released by the plant; (iii) the dosage of chemicals received by each plaintiff; (iv) the method of exposure to the chemicals by each plaintiff; and (v) individual health and medical histories."); *Hurd v. Monsanto Co.,* 164 F.R.D. 234, 239 (S.D. Ind. 1995) ("[E]ach plaintiff was exposed to different levels of PCBs for different amounts of time in different areas of the plant. Each putative class member's susceptibility to injury from PCBs will vary. Thus, no single proximate cause inquiry applies equally to each putative class member; no one set of operative facts establishes liability."); *Commonwealth of Puerto Rico v. The M/V Emily S,* 158 F.R.D. 9, 15 (D.P.R. 1994) ("[N]o one set of facts could establish the fact of injury and causation for each plaintiff."); *Thomas,* 846 F. Supp. at 1404 ("[Class certification] would start hundreds or thousands of individual mini-trials on complex causation and damages issues").

259 F.3d at 166.  The "form that a trial on [class] issues would take" here is an unmanageable morass of individualized evidence relating to each putative class member, defeating the intended utility of the class action device.  The motion for class certification should be denied.

**I.      Class Certification Should Be Denied Because Plaintiffs' Proposed Classes Cannot Even Be Defined Until The Court Has Heard The Trial On The Merits.**

Plaintiffs bear the burden of defining their proposed classes in a manner that is "precise, objective and *presently ascertainable*."  *Black v. The Premier Co.,* 2002 U.S. Dist. LEXIS 26461, *16 (E.D. Pa. Aug. 13, 2002) (emphasis added); *see also LaBauve,* 231 F.R.D. at 664 ("[T]he Court cannot . . . certify amorphous, ill-defined [classes] based on mere speculation that plaintiffs might someday formulate meaningful [class] definitions.").  Most importantly, the proposed classes must be "determined at the *outset* of the litigation," without an inquiry into the merits of plaintiffs' claims.  *Kline v. Security Guards, Inc.,* 196 F.R.D. 261, 266 (E.D. Pa. 2000). The classes plaintiffs propose here fail this basic prerequisite.

As a threshold matter, plaintiffs offer conflicting definitions of the proposed medical monitoring class in the amended complaint and in their memorandum.  *Compare* Amended Complaint at ¶ 109 *with* Mem. at 25.  But neither proposal would allow the Court to ascertain membership of the class without reaching the merits of the case.

First, as defined in the amended complaint, plaintiffs' proposed medical monitoring class

> consists of those persons who currently own property in or reside in, or in the past owned or resided in property ***that has been impacted by toxic contamination from defendants' properties***, or on which the threat of impact such [sic] exists.

Amended Complaint ¶ 109 (emphasis added).  Plaintiffs' experts have made clear that they cannot now identify what properties, if any, have been "impacted by toxic contamination from defendants' properties."  *See* Ginsberg Dep. at 85:12-86:8, 145:21-146:7; Hill Dep. at 60:3-61:12, 62:5-65:7, 65:15-66:5, 68:12-69:13.

By contrast, the groundwater evaluation program established by Rohm and Haas long before this litigation began, ***as well as numerous well tests conducted in the proposed class area both before and during this action***, demonstrate that while there is a groundwater plume of chemicals associated with these facilities, it comes nowhere near McCullom Lake Village. Within the past nine months, plaintiffs have tested 30 wells in McCullom Lake Village and the County has tested 9.  Not a single well has been detected with any chemical mentioned in plaintiffs' complaint, or any other known or theorized human carcinogen.

Thus, the make up of the medical monitoring class as defined in the amended complaint cannot be known until:  (a) plaintiffs' and defendants' experts testify at trial; *and* (b) this Court *resolves the disputes* in their testimony.  Hence, plaintiffs' request for class certification fails at the starting gate, because they have "defin[ed] classes in a manner making the actual composition only determinable at the conclusion of all proceedings."  *In re Paxil Litig.,* 212 F.R.D. 539, 545 (C.D. Cal. 2003); *see also Sanneman v. Chrysler Corp.,* 191 F.R.D. 441, 446 (E.D. Pa. 2000) (rejecting proposed class definition "[b]ecause it would be impossible to definitively identify class members prior to individualized fact-finding").

Nor is this fundamental flaw remedied by the unacknowledged alteration in the proposed class that plaintiffs offer in their motion for class certification.  There the class is defined as:

>[a]ll current and former residents of McCullom Lake Village ***exposed to***
>TCE, 1,1-DCE and/or vinyl chloride originating from defendants'
>properties.

Mem. at 25 (emphasis added).

While this definition superficially might seem to make the proposed class more definite insofar as it *seems* to tie membership in the class to a determinate geographic area -- McCullom Lake Village -- in fact this definition suffers from the same defect as that offered in plaintiffs' amended complaint: the definition of the class itself presupposes a "central issue of liability to be decided in the case," *Forman v. Data Transfer, Inc.,* 164 F.R.D. 400, 403 (E.D. Pa. 1995), namely, whether a given current or former resident was *actually exposed* to "TCE, 1,1-DCE and/or vinyl chloride originating from defendants' properties." The Court cannot determine this without the submission of expert testimony by each party as to whether that individual was or was not exposed as plaintiffs allege. This "would entail the very sort of minihearing on the merits of each proposed class member's case" that class actions are supposed to avoid. *Kline,* 196 F.R.D. at 267.

Plaintiffs' proposed definition of the putative property loss class has similar problems. As defined in the amended complaint, this putative class

>consists of those persons who own or owned property in McCullom Lake
>Village as of the date of the filing of this action, and who have incurred or
>will incur costs and expenses and other financial and other losses as a
>result of the toxic contamination from defendants' properties.

Amended Complaint ¶ 111.

As defined in plaintiffs' motion for class certification, the class consists of:

24

> All current and former property owners of McCullom Lake Village who incurred or will incur property remediation costs and expenses or loss of property value due to exposure to TCE, 1,1-DCE and/or vinyl chloride from defendants' properties.

Mem. at 25.

On either of these proposed definitions, membership in the class could not be determined without a "minihearing on the merits of each proposed class member's case," *Kline,* 196 F.R.D. at 267, both as to (a) whether that class member's property was actually "expos[ed] to TCE, 1,1-DCE and/or vinyl chloride from defendants' properties," and (b) whether and to what extent that exposure may have caused loss of value or remediation expenses, an issue highly dependent upon the unique features of each property. *See* Roddewig Report at ¶¶ 7.J, L, M, O, attached as Exhibit F. There is no benefit to the Court or the parties in certifying such a class.

In sum, plaintiffs have failed to meet their burden of providing "precise, objective and presently ascertainable" criteria of class membership. "Plaintiffs are effectively asking this Court to accept on faith that they will formulate a meaningful, appropriate, reasonable definition of their [proposed classes] during the merits phase." *LaBauve,* 231 F.R.D. at 664. Rule 23 permits no such a leap of faith. The Court should deny the motion for class certification.

## II.     Class Certification Should Be Denied Because Plaintiffs Cannot Demonstrate Commonality, Typicality And Adequacy Of Representation.

A class action is maintainable only if the representative plaintiffs can establish the four prerequisites under Federal Rule of Civil Procedure 23(a):  (1) the class is too numerous to permit joinder; (2) there are questions of law or fact common to the class; (3) plaintiffs' claims

are typical of the claims of the class; and (4) plaintiffs will fairly and adequately protect the interests of the class.  Plaintiffs have failed to establish any of them.

### A.  Plaintiffs Have Failed To Demonstrate That There Are Common Questions Of Law Or Fact.

Plaintiffs assert that "[t]he central questions in this dispute -- whether there was exposure, whether the exposure places residents at risk -- are common to all class members." Mem. at 5.  But this bare assertion does not begin to demonstrate that there are questions common to all putative class members as Rule 23(a)(2) requires; "it is not that easy to state that commonality exists."  *Reilly,* 965 F. Supp. at 597.   Plaintiffs are attempting to create the *illusion* of common questions by "lifting the description of [their] claims to a level of generality that tears them from their substantively required moorings to actual causation and discrete injury."  *In re Fiberboard Corp.,* 823 F.2d 706, 712 (5th Cir. 1990).  As in *Reilly,*

> all plaintiffs are said to have been exposed to . . . emissions from
> [defendants' facilities], but whether and to what extent the emissions are
> said to have affected each class member is not common to all involved.
> Furthermore, assuming arguendo that the plaintiffs possess common
> claims which contain common issues of law or fact, such issues are altered
> or changed by the individual facts and situations of each plaintiff.  This
> destroys anything common to the class.

965 F. Supp. at 597-98.[12]

It is highly doubtful that plaintiffs can properly assert a cause of action for medical monitoring in this case.[13]  But even if they had such a claim, they could not prevail

---

[12]     *Cf. Falcon,* 457 U.S. at 155 (common questions are only those "applicable *in the same manner* to each member of the class") (emphasis added); *cf. also Webb v. Merck & Co.,* 206 F.R.D. 399, 405 (E.D. Pa. 2002) (finding no commonality where plaintiffs' claims could not be proved by evidence applicable in the same manner to each class member).

simply by proving, as they suppose, that there has been "community exposure" to chemicals originating from defendants' facilities, and that the chemicals at issue are "proven hazardous substance[s]." Mem. at 32. Such abstract assertions, untethered to any individual's actual claim, show nothing. Rather, each putative class member must demonstrate actual exposure to the chemicals at issue and that this exposure "caused [him or her] to have a significantly increased risk of contracting serious latent diseases thereby demonstrating the need for medical monitoring." *Barnes,* 161 F.3d at 145.

By definition, this will require each individual putative class member to prove numerous facts relating to him or her and to no other putative class member, "such as time, level, and duration of exposure, family medical history, dietary habits, age, and place of residence" in relation to the alleged contamination plume. *Ball,* 212 F.R.D. at 392; *see also Newton,* 163 F.R.D. at 632 (denying class certification where "numerous factors" would have to be proved by "plaintiff-specific information," "such as: (i) the length of time a particular plaintiff resided in the area near [defendant's] site; (ii) the duration of exposure to the chemicals released from the plant; (iii) the dosage of chemicals received by each plaintiff; (iv) the method of exposure to the chemicals by each plaintiff; and (v) individual health and medical histories"). Moreover, plaintiffs' toxicologist Dr. Ginsberg made clear that any individual's "case for cause and effect"

---

[13]    Plaintiffs assume without any argument that they may assert a claim for medical monitoring under Pennsylvania law. *See* Mem. at 30 (citing the elements of medical monitoring under *Redland Soccer Club, Inc. v. Dep't of the Army,* 548 Pa. 178, 696 A.2d 137 (1997)). But the law of Illinois, not Pennsylvania, presumably governs plaintiffs' substantive claims and it is extremely doubtful that Illinois would permit a recovery for medical monitoring without proof of a present physical injury. *See Pelzer v. Lockformer Co.,* 2005 U.S. Dist. LEXIS 14520, *9 (N.D. Ill. Jul. 6, 2005) ("Illinois courts and federal courts interpreting Illinois law have grappled with the medical monitoring remedy and have produced less than clear results."); *Jensen v. Bayer AG,* 2007 Ill. App. LEXIS 74,*20-*24 (Ill. App. Ct. Feb. 2, 2007) (refusing to recognize "a claim for medical monitoring for potential *future* harm, where no present injury is shown") (emphasis in original).

would depend on numerous unique details about that individual, including factors that might

increase that individual's risk of developing brain cancer independent of any alleged exposure to

chemicals from defendants' facilities, such as exposure to therapeutic ionizing radiation, or that

individual's own DNA repair capability.  Ginsburg Dep. at 135-137; 230-234, attached as

Exhibit N.  In addition, each putative class member will have to prove that chemicals to which he

or she was exposed, if any, came from one of defendants' facilities, and not from some source on

his or her own, or a neighbor's property, such as the failed septic systems plaintiffs themselves

have testified are common in the Village.  Gates Dep. at 20:3-21:16, attached as Exhibit P.

   Plaintiffs attempt to argue that these individual differences in putative class

members' proof of exposure and causation are "not relevant" because it could be that every

putative class member has exceeded an alleged "danger point" of exposure, making further

differentiation unnecessary.  Mem. at 31, 32 (citing *In re School Asbestos Litig.,* 789 F.2d 996,

1009-1010 (3d Cir. 1986)).  This assertion (and the citation to *School Asbestos*) does nothing to

establish Rule 23(a)'s commonality requirement because there is no expert testimony, or any

other evidence, supporting plaintiffs' speculative assertion that all putative class members have

been exposed to TCE, 1,1-DCE or VC above a "danger point," or that there even *is* a "danger

point" of exposure, let alone one that would apply to every class member.  To the contrary, there

is no valid epidemiological or toxicological evidence that VC exposure cause brain cancer.  Even

plaintiffs' toxicologist asserts that "***vinyl chloride by itself is unlikely to cause cancer***."

Ginsberg Dep. at 237:11-238:20 (emphasis added), attached as Exhibit N.  Thus, if there were

some hypothetical "danger point" of VC that could create a risk for brain cancer -- and there is

no evidence that there is -- there would be a different "danger point" of exposure for each

putative class member, based on his or her "level of activation and [DNA] repair" and numerous

other factors.  *Id.* at 219:21-220:3.  "***Not everyone has the same level of activation and repair***." *Id.* at 231:12-25 (emphasis added).

Plaintiffs cite *Leach v. E.I. DuPont de Nemours & Co.,* 2002 WL 1270121 (W. Va. Cir. Ct. April 10, 2002), for the erroneous proposition that in cases "arising from a chemical release, commonality is readily found."  Mem. at 30.  But as support for that proposition, *Leach* in turn relies on outmoded case law decided when medical monitoring theories (which even today are quite novel in many jurisdictions) were brand new and courts had not yet gained an appreciation for the unmanageable complexities these types of claims raise in a class setting. *See, e.g., Yslava v. Hughes Aircraft Co.,* 845 F. Supp. 705 (D. Ariz. 1993) (cited in Mem. at 30, 47); *Day v. NLO, Inc.,* 144 F.R.D. 330 (D. Ohio 1992) (cited in Mem. at 47).  These cases, which obviously are not binding on this Court, were decided prior to *Barnes,* the controlling authority here.  *Barnes* makes clear that medical monitoring claims require specific proof of causation as to each putative class member, necessarily injecting individualized issues that destroy commonality.  *See Barnes,* 161 F.3d at 145; *cf. Blain v. Smithkline Beecham Corp.,* 2007 U.S. Dist. LEXIS 5460, at *16 (E.D. Pa. Jan. 25, 2007) (where "a plaintiff-specific analysis dominates the causation inquiry," "causation does not provide a common question").[14]

As for plaintiffs' claims for property damage (*i.e.,* negligence, nuisance, ultrahazardous activity, etc.), these are no less saturated with individualized issues.  Each putative class member must prove that his or her property was exposed, and the extent, if any, to which this exposure caused a loss in the value of the property.  "[P]laintiffs have come forward

---

[14]    *Leach* also relies on *O'Connor v. Boeing North American, Inc.,* 184 F.R.D. 311 (C.D. Cal. 1998), as do plaintiffs.  *See* Mem. at 48.  The class in that case was later ***decertified*** when the court determined that its earlier decision had been improvident.  *See O'Connor v. Boeing North American, Inc.,* 197 F.R.D. 404 (C.D. Cal. 2000).

with no scientific testimony under which these chemicals would have uniformly blanketed the area of concern." *Fisher,* 2006 U.S. Dist. LEXIS 48395 at *107-*108.  To the contrary, because of the "complex nature of hydrogeology," if there is any contamination in the groundwater in the Village, it likely will "vary markedly from well-to-well." *Thomas,* 846 F. Supp. at 1404 (denying class certification so as to avoid "individual mini-trials on complex causation and damages issues").  Indeed, plaintiffs' own hydrogeologist Hill has admitted that "[i]t's certainly possible that there will be differing levels of contamination [in different wells]." Hill Dep. at 144:5-145:7.  Thus, "common proof will not show that any plaintiff's property is, in fact, contaminated." *Fisher,* 2006 U.S. Dist. LEXIS 48395, at *107-*108.  Rather, "the existence of contamination and the risk of future contamination will have to be proven on a property-by-property [and class member by class member] basis." *Id.*; *see also LaBauve,* 231 F.R.D. at 673 ("Whether a plaintiff's property is contaminated, the source(s) of such contamination, the extent of such contamination, the cause and timing of harm, and the resulting damage (measured in diminution of property value) are all questions that will require plaintiff-by-plaintiff scrutiny.").

And even if contamination were found in a particular well, or on a particular property -- which has not been the case -- plaintiffs have made no effort to explain how this might affect the value of the property, or how this issue could be effectively litigated on a class wide basis.  As defendants' real estate valuation expert explains:

> [A]ny evidence that one area, one neighborhood, one house, or one property, or one or more properties may have suffered impairment [by contamination] is not necessarily proof that any other area, neighborhood, house, or property in the proposed class area, has been similarly impaired. This is due to the fact that in situations such as that in the proposed class area involving a large number of properties encompassing a wide geographic area, a wide variety of uses, physical characteristics, neighborhoods, variations in topography and groundwater and surface water conditions, variation in groundwater testing results, and variation in

> duration of property ownership, a single uniform, consistent, and common method to measure real property impairment is not possible.  Instead, each neighborhood and each property must be separately analyzed to determine how the elements of possible real estate impairment vary form one property to the next.

Roddewig Report at ¶ 8.F, attached as Exhibit F.

In sum, plaintiffs have failed to satisfy their burden of showing that there are questions of law or fact common to every member of the class.

**B.      Plaintiffs Have Failed To Demonstrate That Their Claims Are Typical Of Their Proposed Classes.**

Plaintiffs have failed to demonstrate that their claims are typical of the class for several reasons.

First, as discussed further in the next section, plaintiffs' claims are solely for medical monitoring and property loss, and they expressly disavow any claim for personal injuries.  By contrast, others may believe that they do have such injuries.  *See* Deposition of Joseph Zakrocky, attached as Exhibit M, at 35:3-10.  *See also* Ginsberg Dep. at 25:13-15, 30:1-31:4, attached as Exhibit N.

Second, as already explained, plaintiffs have made no attempt to provide adequate characterizations of their proposed medical monitoring and property loss classes that would enable the Court to determine membership in the class without considering the merits of plaintiffs' claims.  "[I]n the absence of a clearly defined class, the typicality requirement cannot be met."  *In re Paxil Litig.,* 212 F.R.D. at 549.

### C.     Plaintiffs Have Failed To Demonstrate That They Will Adequately Represent Their Proposed Classes.

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997).  Here the conflict is glaring.

Plaintiffs seek medical monitoring and property damages on behalf of the class but no recovery for personal injuries.  This approach may work for the named plaintiffs, but other putative class members may believe that they do have such injuries.  *See, e.g.,* Zakrocky Dep. at 35:3-10; Ginsberg Dep. at 25:13-15, 30:1-31:4.[15]  Given Pennsylvania's and Illinois's stringent rules against claim splitting, putative class members likely would find such personal injury claims extinguished -- *even if they ultimately were to prevail in this action*.[16]  Plaintiffs

---

[15]     Plaintiffs assert that the proposed medical monitoring class "expressly excludes [individuals] with personal injuries caused by defendants." Mem. at 48.  But plaintiffs' definition contains no such limitation.  Nor would there be any feasible method of excluding these individuals, such as an *ad hoc* condition that the class include only "asymptomatic" individuals.  "[T]he questions whether an individual is asymptomatic or has manifested physical injury can be determined only by a physician.  And a class definition that calls for a medical conclusion based on plaintiff-specific information is an improper basis for maintaining a class action."  *In re Rezulin Prods. Liab. Litig.,* 210 F.R.D. at 74 (internal quotation marks omitted).

[16]     *See, e.g., Spinelli v. Maxwell,* 430 Pa. 478, 480 (1968) ("When personal injuries to a person and damages to his property arise from the same cause and the same tortious act, the person who has sustained such personal injuries and property damage *must* seek recovery for both in single action and, if separate actions are instituted for each category of damage and a judgment is rendered in one of such actions, the entry of such judgment has the effect of *res judicata* and bars recovery in the other action.");  *Dillon v. Evanston Hosp.,* 199 Ill. 2d 483, 502, 771 N.E.2d 357, 369 (2002) ("An entire claim arising from a single tort cannot be divided and be the subject of several actions, regardless of whether or not the plaintiff has recovered all that he or she might have recovered.  *This is true even as to prospective damages*.  There cannot be successive actions brought for a single tort as damages in the future are suffered, *but the action must embrace prospective as well as accrued damage*.") (emphasis added);  *Mason v. Parker,* 295 Ill. App. 3d 1096,

cannot adequately protect such putative class members' interests.  *See Martin v. Home Depot U.S.A., Inc.,* 225 F.R.D. 198, 203 (W.D. Tex. 2004) (plaintiffs' "failure to seek full recovery by splitting out personal injury and property damage claims creates a significant conflict of interest destroying adequacy of representation"); *Thompson v. American Tobacco Co.,* 189 F.R.D. 544, 551-52 (D. Minn. 1999) (refusing certification where named plaintiffs sought medical monitoring and purported to "reserve" claims for personal injuries, because the "possible prejudice to [absent] class members is simply too great for the Court to conclude that the named Plaintiffs' interests are aligned with those of the class").[17]

What is more, putative class members' only conceivable means of protecting themselves -- opting out of plaintiffs' classes -- **would be unavailable** if this Court permits plaintiffs to bring their claim for medical monitoring under 23(b)(2).  Unlike an action under 23(b)(3), "unnamed members are bound by the [result of a 23(b)(2)] action without the opportunity to opt out."  *Barnes,* 161 F.3d at 142-43.

---

1097-98, 695 N.E.2d 70, 72 (1998) (subsequent action for personal injuries barred where plaintiff sought only property damage in prior action).

[17]   *See also Ardoin v. Stine Lumber Co.,* 220 F.R.D. 459, 466-67 (W.D. La. 2004) ("[T]he doctrine of *res judicata* would forever bar [any] personal injury claims of [absent class members] . . . subjecting them, instead, to the limited damages allowed under the present cause of action.  It is this disparity of claims that prevents the plaintiffs from meeting the commonality requirement, and it is the consequences of not recognizing the disparity of these claims that prevents the class members from adequately representing the class."); *In re Methyl Tertiary Butyl Ether* (*MTBE*) *Prods. Liab. Litig.,* 209 F.R.D. 323, 340 (S.D.N.Y. 2002) (holding that where the "named plaintiffs actually claim no personal injury," their "relatively weak incentive to prosecute this case," when "viewed against the risk that subsequent courts would preclude absent class members from bringing personal injury claims," "leads to the inescapable conclusion that that the class representatives are inadequate"); *O'Connor,* 197 F.R.D. at 417 (decertifying class because court could not "find that the present class representatives would be adequate representatives," where "unnamed class members could be precluded from prosecuting claims that might provide for a greater level of recovery").

In sum, plaintiffs' "failure to seek full recovery" by splitting off putative class members' claims for personal injuries "creates a significant conflict of interest destroying adequacy of representation." *Martin,* 225 F.R.D. at 203. Because plaintiffs fail to meet any of the criteria under Rule 23(a), their motion for class certification should be denied.

## III.  The Proposed Property Loss Class Fails The Predominance And Superiority Tests Under Rule 23(b)(3).

Plaintiffs seek to have the Court certify their proposed property loss class under Rule 23(b)(3). Certification under this subsection is proper only where

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3).

As we explain here, this Court cannot find that common questions of law or fact predominate over individual questions or that a class action would be superior to separate litigation of individual claims. Hence, plaintiffs' motion for class certification should be denied.

### A.  The Proposed Property Loss Class Fails The Predominance Test.

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.,* 521 U.S. at 622. To that extent, the predominance inquiry shares the same concerns as commonality, typicality and adequacy of representation under Rule 23(a): providing the Court with some assurance that absent class members would be willing to cede control of their own claims to the named plaintiffs. But the predominance inquiry is far more stringent than the preconditions

under Rule 23(a), because plaintiffs must demonstrate not merely that the claims theoretically *could* be prosecuted as a class action (the thrust of the 23(a) requirements), but that it is *worth* expending the resources of the Court and the parties to use the class device.

Here, individual issues relating to each putative class member's claim for property loss would overwhelm the issues that plaintiffs assert are "common" to putative class members. As to liability, "plaintiffs have come forward with no scientific testimony under which these chemicals would have uniformly blanketed the area of concern." *Fisher,* 2006 U.S. Dist. LEXIS 48395 at *107-*108.  Each individual putative class member would have to put on expert testimony showing that his or her own drinking water well or property is (or was) contaminated, when that contamination occurred, and how long it lasted.  Defendants would then be "entitled to present evidence rebutting the existence or cause" of any alleged contamination, *In re Paxil,* 212 F.R.D. at 547, and the so-called "class" trial would "degenerate in practice into multiple lawsuits separately tried," *Steering Committee,* 461 F.3d at 64.

Likewise, as to damages, "plaintiffs have made no pretense of presenting expert opinion or other evidence tending to show that damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, so as to obviate individualized damages as an impediment to class certification."  *Fisher,* 2006 U.S. Dist. LEXIS 48395 at *111.  To the contrary, each individual putative class member would have to prove by expert testimony how the alleged contamination of his or her own property affected its value, and the extent of the loss suffered, if any.  In rebuttal, defendants would be entitled to prove by expert testimony that whatever contamination may have been present on this putative class member's property, it:  (i) could never have caused a loss of value, or (ii) if it did cause a loss of value in the past, that loss has long since disappeared through the natural abatement of the

contamination and the appreciation of the value of the property.  These individualized issues

clearly predominate over generic issues of "community exposure."  *See, e.g., Steering*

*Committee,* 461 F.3d at 602 ("[W]here individual damages cannot be determined by reference to

a mathematical or formulaic calculation, the damages issue may predominate over any common

issues shared by the class."); *see also Newton,* 259 F.3d at 188 (rejecting "[p]laintiffs'

suggest[ion] [that] their expert could calculate the amount of damages each class member has

sustained thereby removing proof of injury as an obstacle to certification").[18]

### B.      The Proposed Property Loss Class Fails The Superiority Test.

Plaintiffs assert that superiority is satisfied because "the only individuals who

have the motivation to bring suit on their own behalf are those unfortunate few who already have

contracted brain cancers and are suing for significant personal injury damages."  Mem. at 48.

Others "cannot afford to litigate on their own behalf only."  *Id.*  But the Third Circuit has made

clear that the contention that "each individual claim is so small that only a class action will

provide a remedy," without more, never is a basis for class certification:  "this factor by itself is

---

[18]      Plaintiffs' suggestion that the Court limit the "class" phase to liability only, leaving
putative class members on their own to "calculate their individual damages, if any,"
Mem. at 47, does not solve plaintiffs' predominance problems.  Plaintiffs "cannot
manufacture predominance through the nimble use" of bifurcation.  *Castano,* 84 F.3d at
745 n.21.  For the same reason, plaintiffs' reliance on *Sterling v. Velsicol Chem. Corp.,*
855 F.2d 1188 (1988) and *Mejdrech v. Met-Coil Sys. Corp.,* 319 F.3d 910 (7th Cir. 2003),
*see* Mem. at 47, is misplaced.  These cases held that the district courts had not abused
their discretion in bifurcating the litigation into a class-wide liability phase and individual
follow-on proceedings to prove damages.  *See Sterling,* 855 F.2d at 1200, *Mejdrech,* 319
F.3d at 910.  But even where such bifurcation is invoked, "the cause of action, *as a
whole*, [still] must satisfy the predominance requirement of [23(b)(3)]."  *Castano,* 84 F.3d
at 745 n.21 (emphasis added).  As we have demonstrated, plaintiffs' "cause of action, as a
whole" does *not* satisfy the predominance requirement because numerous individual
issues relating to exposure, causation and risk pervade plaintiffs' liability case.  Leaving
class members to "calculate their individual damages" does not make plaintiffs' proposed
property loss class any more suited for class certification.

insufficient to overcome the hurdles of predominance and superiority and efficient and fair management of a trial."  *Newton,* 259 F.3d at 191.

In addition, a brief look at the sixteen lawsuits brought by the individual state court plaintiffs demonstrates the inferiority of the class approach.  These individual suits are a far better way to litigate the alleged contamination in the Village -- which well tests have repeatedly failed to detect -- than certifying an unmanageable class action without any assurance that plaintiffs' claims have any merit.  *Cf., e.g., In re Rhone-Poulenc Rorer Inc.,* 51 F.3d 1293, 1299 (7th Cir. 1995) (explaining that a class action was not superior to the "consensus or maturing of judgment" obtained by individual litigation, where twelve of thirteen prior individual lawsuits based on similar allegations had ended in verdicts against the plaintiffs); *Castano,* 84 F.3d at 747 ("[A] mass tort cannot be properly certified without a prior track record of trials from which the district court can draw the information necessary to make the predominance and superiority [findings] required by rule 23.").  Where, as here, there is an opportunity to test the viability of plaintiffs' claims in individual lawsuits based on the same basic allegations of exposure and causation, utilizing that opportunity is far superior to class litigation.

In sum, plaintiffs have failed to demonstrate predominance or superiority under Rule 23(b)(3).  Plaintiffs' motion for class certification should be denied.

## IV.    The Proposed Medical Monitoring Class Fails The Requirements For Certification Under Rule 23(b)(2).

Plaintiffs seek certification of their proposed medical monitoring class under Rule 23(b)(2).  A class action is maintainable under this section only where:

1)        the relief plaintiffs seek is injunctive or declaratory, directed to the class as a whole, not relief that is tailored to the unique details of each individual class member's alleged injury, *Barabin v. Aramark Corp.,* 2003 U.S. App. LEXIS 3532, at *4; and

2)        the proposed class is suitably "cohesive," *Barnes,* 161 F.3d at 142-43.

This "cohesiveness" requirement is even more demanding than predominance under Rule 23(b)(3).  *See id.* (noting that "a (b)(2) class may require more cohesiveness than a (b)(3) class").  The Court must assure itself that "individual issues do not pervade" the action because "unnamed members with valid individual claims are bound by the action without the opportunity to withdraw and may be prejudiced by a negative judgment."[19]  *Id.* at 143. Moreover, "the suit could become unmanageable and little value would be gained in proceeding as a class action . . . if significant individual issues were to arise consistently."  *Id.* (citation and internal quotation marks omitted).

Plaintiffs have failed to demonstrate that the conditions for certification under Rule 23(b)(2) are satisfied.  They have not shown that the medical monitoring they seek is appropriate relief under this subsection and they cannot overcome the complete lack of cohesiveness in the proposed class.

**A.      Plaintiffs Have Not Demonstrated That The Medical Monitoring They Seek Truly Qualifies As Injunctive Relief.**

As a threshold matter, plaintiffs fail to demonstrate that their proposed medical monitoring class is even a candidate for certification under Rule 23(b)(2).

---

[19]      Unlike an action under 23(b)(3), "unnamed members are bound by the [result of a 23(b)(2)] action without the opportunity to opt out."  *Barnes,* 161 F.3d at 142-43.

First, plaintiffs have failed even to *describe* their proposed medical monitoring program beyond vague allegations in their complaint, let alone satisfy any of the criteria adopted by the ATSDR for medical monitoring programs.  *See* Valberg Report at 16-17, attached as Exhibit D.  This makes it impossible for this Court to assess whether this relief is genuinely "injunctive" (and thus appropriately handled under Rule 23(b)(2)), or whether plaintiffs are in essence seeking money damages for the cost of medical examinations in the future (relief that, were it appropriate for classwide treatment at all, would have to be handled under Rule 23(b)(3)).  *See, e.g., Arch v. American Tobacco Co.,* 175 F.R.D. 469, 484 (E.D. Pa. 1997) (denying class certification under Rule 23(b)(2) where plaintiffs' medical monitoring claims were "merely a thinly disguised claim for future damages").

Second, plaintiffs are seeking more than medical monitoring relief in this action. "[I]n addition to demanding creation of a medical monitoring fund, they are demanding compensatory and punitive damages for such claims as negligence, trespass [and] nuisance." *Ball,* 212 F.R.D. at 390.  In these circumstances, the Court must assess whether the claim for medical monitoring has genuine value to the plaintiffs apart from a claim for damages.  "[A] district court . . . must be satisfied 'that a reasonable plaintiff, based on a medical and economic calculus, would have sued solely for a medical monitoring program, not merely that a lawyer could have been found who would have located a plaintiff and brought a class action in the hope of a fee.'"  *In re St. Jude Medical, Inc.,* 425 F.3d 1116, 1122 (8th Cir. 2005) (quoting *In re Rezulin Prods. Liab. Litig.,* 210 F.R.D. at 73).  Because "[t]he record . . . is silent as to the cost of the proposed medical monitoring program or its value to individual class members," plaintiffs request for class certification "fail[s] right at the outset."  *In re Rezulin Prods. Liab. Litig.,* 210 F.R.D. at 72-73.

39

**B.      Plaintiffs' Proposed Medical Monitoring Class Has No Cohesiveness.**

It is well known that "medical monitoring classes suffer from cohesion difficulties, and numerous courts across the country have denied certification of such classes." *In re St. Jude Medical, Inc.,* 425 F.3d at 1122.  Putative class members in such cases "share little in common": "[i]t is unclear [who, if any] will contract . . . disease and, if so, what disease each will suffer.  They will also incur different medical expenses because their monitoring and treatment will depend on singular circumstances and individual medical histories."  *Amchem Prods.,* 521 U.S. at 624.

Plaintiffs present an utterly simplistic picture of the form a "class" trial in this action would take.  They erroneously suggest that they can establish a single "danger point" of exposure to VC (or other chemicals) that would apply to each putative class member, such that any putative class member exposed at that level would warrant medical monitoring.  Mem. at 32.  But no expert in this case has testified that there is any such "danger point."  And even if there were, no expert has testified that *every* putative class member has been exposed at that level.  To the contrary, the experts on both sides are in agreement have testified that the concentrations of contaminants, if any, likely would vary from well to well and exposure would vary from person to person.  Mutch Report at 4-15 – 4-16, attached as Exhibit A; Hill Dep. at 143:17-145:7, attached as Exhibit J.

Likewise, plaintiffs wrongly suppose that they can prove a "causal link between exposure and increased risk" using "[e]xpert testimony on the carcinogenicity of the chemicals of concern" without any reference to "individual circumstances."  Mem. at 34.  This is the same mistake the plaintiffs in *Barnes* made:

> Plaintiffs suggest that causation can be proved on a class-wide basis, contending they need to show only that smoking cigarettes was a 'substantial factor' in 'causing' the three diseases to be monitored in the program . . . . But plaintiffs cannot prove causation by merely showing that smoking cigarettes causes cancer and other diseases.  They must demonstrate that defendants' intentional or negligent nicotine manipulation caused *each individual plaintiff* to have a significantly increased risk of contracting serious latent diseases thereby demonstrating the need for medical monitoring.

161 F.3d at 145 (emphasis added); *cf. In re Agent Orange,* 818 F.2d 145, 165 (2d Cir. 1987) ("The relevant question . . . is not whether Agent Orange has the capacity to cause harm, the generic causation issue, but whether it did cause harm and to whom.  That determination is highly individualistic, and depends upon the characteristics of individual plaintiffs (e.g., state of health, lifestyle) and the nature of their exposure to Agent Orange.").

Moreover, plaintiffs' own toxicologist Ginsberg contradicts their assertion that the "carcinogenicity of the chemicals of concern" can be proved in this generic way.  To the contrary, he explained that VC "by itself is unlikely to cause cancer.  *It has to be activated.*" Ginsberg Dep. at 237:21-238:20 (emphasis added), attached as Exhibit N.  And each individual putative class member's susceptibility to brain cancer further depends on the level of activity of his or her "DNA excision repair enzyme."  *Id.* at 229:19-230:21.  "Not everyone has the same level of activation and repair."  *Id.* at 231:12-25.  Thus, the "carcinogenicity" of these chemicals is highly dependent upon individual facts about each putative class member's physiology.[20]

---

[20]   *Cf. In re Paxil Litig.,* 212 F.R.D. at 547 (explaining that whether plaintiffs prove causation by "placing individuals on the stand or by introducing 'scientific evidence,' [defendants] would (fairly) assert that [they are] entitled to present evidence rebutting" each putative class member's contention that defendants caused his or her injury).

Indeed, not only must each putative class member prove that defendants caused their alleged increased risk of developing brain cancer, each must prove the particular medical monitoring regime that would be appropriate for him or her:

> [E]ach class member must prove that the monitoring program he requires is different from that normally recommended in the absence of exposure. To satisfy this requirement, each plaintiff must prove the monitoring program that is prescribed for the general public and the monitoring program that would be prescribed for him.  Although the general public's monitoring program can be proved on a classwide basis, an individual's monitoring program by definition cannot.

Barnes, 161 F.3d at 146.  Plaintiffs have offered no expert testimony that each putative class member should receive any medical monitoring at all, let alone the same monitoring.  Nor would such a suggestion be at all plausible given the likely variation in putative class members' physiology and exposure, if any.  These issues are made all the more complicated by plaintiffs' toxicology experts' opinion that some putative class members' physiologies may put them at a heightened risk of developing brain cancer even apart from plaintiffs allegations of chemical exposure.  These individuals presumably "already require[] future medical monitoring as an ordinary part of his or her follow-up care . . . [and] may or may not require additional monitoring [based on plaintiffs' allegations]."  In re St. Jude Medical, Inc., 425 F.3d at 1112.  Whether he or she does require additional monitoring that might be attributable to defendants would be "an individualized inquiry depending on that patient's medical history," physiology, and exposure, if any.  Id.

In short, plaintiffs' proposed medical monitoring class is not "cohesive" with respect to any of the crucial issues of exposure, causation and risk.  Plaintiffs' request for certification of this class under Rule 23(b)(2) should be rejected.

## V.     Plaintiffs' Proposed Injunctive Relief Class Is No More Suitable For Certification Than Their Other Proposed Classes.

In addition to their proposed medical monitoring and property loss classes, plaintiffs seek certification of an "injunctive relief class" consisting of "[a]ll current property owners of McCullom Lake Village who seek injunctive relief in the form of measures to safeguard their wells and water supply." Mem. at 25. The requested relief includes "a Court order directing defendants to provide municipal water to replace private wells," and remediation of alleged contamination from individual properties. Mem. at 46. Certification of this putative class must be rejected for the same reasons as the medical monitoring and property loss classes.

Under Federal Rule of Civil Procedure 65, an injunction must be "specific in terms [and] shall describe in reasonable detail the act or acts sought to be restrained." Thus, this Court cannot issue a vague, general mandate, such as "abate any contamination in the Village." Rather, the Court may only direct that defendants take specific steps to remediate a specifically identified individual property based on a showing that that property is contaminated at levels that are unsafe to the residents of that property. *See In re MTBE Litig.,* 209 F.R.D. at 345 ("[P]laintiffs' requested injunction for 'the provision of clean water' and 'remediation of contaminated wells' is too broad to satisfy Rule 65(d)."). As with the claims for medical monitoring and property loss, this would require separate submissions of fact and expert testimony as to whether that particular property is contaminated and whether the level of contamination is unsafe to that property's residents. Thus, the requested injunctive relief could never be litigated on a class-wide basis.

Plaintiffs' request for an order that defendants "provide for municipal water to replace private wells" fails for precisely the same reason. Ordering defendants to connect all

properties in the Village to a municipal water supply would give a windfall to those properties owners who cannot demonstrate any contamination.  Hence, only individuals who could actually demonstrate current contamination of their wells would be entitled to this relief.  Again, this would require separate submissions of fact and expert testimony for each class member rendering class certification pointless.

**VI.    Plaintiffs' Proposed Punitive Damages Class Cannot Be Certified.**

Lastly, plaintiffs' proposed punitive damages class cannot be certified.  Neither Pennsylvania nor Illinois recognizes an independent cause of action for punitive damages. *DiGregorio v. Keystone Health Plant Trucking Co.,* 840 A.2d 361, 370 (Pa. Super. Ct. 2003); *Kleinworth Benson North America, Inc. v. Quantum Fin. Servs., Inc.,* 692 N.E.2d 269, 274 (Ill. 1998).  Hence, certification of a class of individuals seeking punitive damages would be proper only if plaintiffs could demonstrate that certification of classes for purposes of adjudicating their substantive claims is proper.  Because plaintiffs cannot establish this, for all of the reasons discussed above, their request for certification of a punitive damages class must be rejected as well.

**CONCLUSION**

For the foregoing reasons, defendants Rohm and Haas Company, Rohm and Haas Chemicals LLC and Morton International Inc. respectfully urge this Court to deny plaintiffs' motion for class certification.

Respectfully submitted,

/s/ Ralph G. Wellington
Ralph G. Wellington (I.D. No. 10068)
Dennis R. Suplee (I.D. No. 03336)
Jennifer A. L. Battle (I.D. No. 86765)
Stephen A. Fogdall (I.D. No. 87444)
Alison C. Finnegan (I.D. No. 88519)
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA  19103
Tel. (215) 751-2488; 2068; 2647
Fax (215) 751-2205

*Attorneys for Defendants*
*Rohm and Haas Company,*
*Morton International Inc., and*
*Rohm and Haas Chemicals LLC.*

Dated:  February 12, 2007.

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of February, 2007, the foregoing Brief in Opposition to Plaintiffs' Motion for Class Certification Submitted by Defendants Rohm and Haas Company, Rohm and Haas Chemicals LLC and Morton International Inc. and two volumes of exhibits were served on the parties as follows:

<u>By ECF and first-class mail</u>:

Aaron J. Freiwald, Esquire
Patricia M. Giordano, Esquire
Glenn A. Ellis, Esquire
LAYSER & FREIWALD, P.C.
1500 Walnut Street, 18th Floor
Philadelphia, PA 19102
*Attorneys for Plaintiffs.*

Albert G. Bixler, Esquire
Eckert Seamans Cherin & Mellott, LLC
1515 Market Street, 9th Floor
Philadelphia, PA 19102
*Attorney for Modine Manufacturing Company.*

<u>By first class mail</u>:

David B. Bartel, Esquire
Quarles & Brady LLP
411 East Wisconsin Avenue
Milwaukee, WI 53202-4497
*Attorney for Modine Manufacturing Company.*

/s/ Ralph G. Wellington